LARAMIE RIVERS COMPANY, a Corporation,
*Plaintiff in error,*

vs.

ERNEST LeVASSEUR, as Water-Commissioner of Water District No. 4 in Water Division No. 1; Wyoming Development Company, a Corporation; and Wheatland Industrial Company, a Corporation,
*Defentants in error.*

LARAMIE RIVERS COMPANY, a Corporation,
*Plaintiff in error,*

vs.

WYOMING DEVELOPMENT COMPANY, a Corporation,
*Defendant in error.*

(Nos. 2399 and 2400; February 8, 1949; 202 Pac. (2d) 680)

416

For the Plaintiff in error, the causes were submitted upon the brief of Corthell and Hitchcock of Laramie, Wyoming, and oral argument by M. E. Corthell and David N. Hitchcock.

For the Defendants in error, the causes were submitted upon the brief and also oral argument of James A. Greenwood of Cheyenne, Wyoming.

## OPINION

Blume, Justice.

Laramie Rivers Company, a corporation herein generally designated as the plaintiff, is a corporation and

the owner of the storage system in connection with Lake Hattie Reservoir. It claims adjudicated water rights of 68,500 acre feet of water, the earliest of which were initiated in 1908 from the Laramie River and the Little Laramie River. The Wyoming Development Company, defendant herein, sometime before the appropriations made by it as hereafter mentioned, acquired the ownership and control of 58,813 acres of land in what is now known as Platte County in this state. The land was not productive without artificial water, so, on May 15, 1883, it undertook to appropriate 633 cubic feet of water per second of time by direct flow from Laramie River in Albany County. See map in report of the State Engineer for 1893-1894 opposite page 137. The water was conveyed from the point of the diversion works by tunnel, creeks and canals onto its land in Platte County. The Board of Control adjudicated the rights of appropriation from Laramie River in 1903, and awarded the foregoing company 633 cubic feet of water per second of time for the irrigation of the 58,813 acres above mentioned with a priority number 17. The lands were specifically described. The adjudication so made to the aforesaid company was approved by the District Court of Laramie County, Wyoming, on December 27, 1912. It stated that at that time 32,700 acres had been irrigated by the company, and it gave time to the Wyoming Development Company to apply water on the remainder of its lands within a reasonable time thereafter.

The foregoing appropriation of water by direct flow was insufficient to properly irrigate the lands above mentioned for the whole irrigating season, and the irrigation of some additional lands was contemplated. So, on January 29, 1898, the Wyoming Development Company filed with the State Engineer application for Permit No. 1724, on a form furnished by the State Engineer, approved on February 1, 1898, to permit the

storage of water of the Laramie River in Albany County as a supplementary supply of water for the irrigation of the lands heretofore mentioned and of 4,747 acres additional land, making a total of 63,500 acres. A period of one year was given to commence the construction of the work. Time until December 1, 1902 was given for the completion of the work. December 31, 1902 was fixed for the purpose of applying the water to beneficial use, but that period was extended later on from time to time. Pursuant to this permit, the Wyoming Development Company impounded the water of Laramie River in Albany County in what is known as Wyoming Development Company Reservoir No. 2 and conveyed the water thence into Platte County. The reservoir is located in Townships 21 and 22, Range 73 in Albany County, and the dam in connection with the reservoir is located partly in Section 31, Township 22, Range 73 aforesaid. Notice that the reservoir had been completed in 1901 was received by the State Engineer in December 1902. On December 22, 1902, the Wyoming Development Company transferred some of its rights in the reservoir to the Wheatland Industrial Company, a corporation, also defendant herein.

An action was brought on July 6, 1938 by the plaintiff against the foregoing defendants and against Ernest LeVasseur as water commissioner. The petition alleged that the water commissioner distributed too much water to the defendants and thus deprived plaintiff of water to which it was entitled. It asked for a declaratory judgment as to the relative rights of the parties. The specific manners contended for and relied upon by the plaintiff will hereafter be discussed in detail, and it would subserve no good purpose to set out the allegations of the petition which is lengthy. The water commissioner appeared and filed a disclaimer of interest in the cause. The other defendants appeared. In addition to denying controverting facts, they pleaded

the statute of limitations and laches and alleged in part that hundreds of farmers had acquired a right in the reservoir in the meantime, while no objections whatever were raised by the plaintiff.

At the time when the foregoing action was instituted, the reservoir right of Reservoir No. 2 above mentioned of the Wyoming Development Company, pursuant to its Permit No. 1724, had not been adjudicated by the Board of Control of this state. The Development Company, however, commenced proceedings for such adjudication in March, 1939, and on or about December 19, 1943, the foregoing board adjudicated the right. It held the capacity of the reservoir to be 98,934 acre feet of water and awarded that much water to the company. All this was done before the action herein was tried. The plaintiff appealed from the decision of the Board of Control to the District Court of Albany County, alleging errors hereinafter fully discussed. The appeal and the action for a declaratory judgment were consolidated for hearing. The District Court confirmed the adjudication made by the Board of Control and ruled against the plaintiff in the action brought in 1938. The plaintiff thereupon appealed to this court, and the action and the appeal above mentioned have also been consolidated for hearing in this court. Other facts in connection with the appropriations of defendant companies may be found in Laramie Irrigation and Power Co. vs. Grant, 44 Wyo. 392, 13 Pac. 2d 235; Campbell vs. Wyoming Development Co., 55 Wyo. 347, 100 Pac. 2d 124, 102 Pac. 2d 745; Anderson vs. Wyoming Development Co. 60 Wyo. 417, 154 Pac. 2d 318; Wheatland Industrial Co. vs. Johnson, 64 Wyo. 120, 186 Pac. 2d 377.

I. Decree of 1912.

The plaintiff claims that the Board of Control in 1903 and the District Court in 1912 illegally adjudicated 633 cubic feet of water per second of time by direct

flow from the Laramie River to the Wyoming Development Company. That claim is based upon the provisions of Section 71-216 W. C. S. 1945, which provides that "Each appropriation shall be determined in its priority and amount, by the time by which it shall have been made, *and the amount of water which shall have been supplied for beneficial purposes."* (Italics supplied). The same section provides that no allotment greater that one cubic foot per second of time shall be made for each seventy acres of land. We shall, for the purposes of this case, disregard the fact that the appropriation by the Wyoming Development Company was made in territorial days and before this limitation was provided by the statute. The decree of 1912 found that only 32,700 acres had been irrigated by the company. Dividing that by seventy makes 467.14 cubic feet per second of time, and counsel for the plaintiff contend that under Section 71-216 supra, the court was powerless to adjudicate to the company more than that amount. It is doubtless true that a definite adjudication of a water right should, ordinarily at least, be made only for water which has been applied to a beneficial use. 56 Am. Jur. 760. New Loveland & Greeley Irrigation & Land Co. vs. Consolidated Home-Supply Ditch & Reservoir Co., 27 Colo. 525, 62 Pac. 366, 52 L.R.A. 266. In this instance, the Board of Control wanted to adjudicate the appropriations from the Laramie River. Most of the appropriations from the river were comparatively small. That of the Wyoming Development Company was large. It had thousands of acres which it expected to sell to settlers. It was a project for settlement as outlined in the case of Campbell vs. Wyoming Development Co., 55 Wyo. 347, 100 Pac. 2d 124, 102 Pac. 2d 745. It could not be expected that all of the lands would be settled and reclaimed at once. The Board of Control evidently felt that its work should not be stopped or hindered by these facts, at the same time reserving to the company

its right which was a territorial right. It should perhaps, under the statutory provisions above mentioned, have only awarded 467.14 cubic feet definitely, and the remainder conditionally, subject to future proof of beneficial use. It did not do so. The board, which in this case acted only a few years after the law relating to adjudication was passed, evidently did not construe the law as it is construed by counsel for the plaintiff in this case. Neither did the District Court in 1912. This court, in Campbell vs. Wyoming Development Co., supra, and in the case of Anderson vs. Wyoming Development Co., 60 Wyo. 417, 154 Pac. 2d 318, considered the court decree of 1912 to be a final decree, and, up to 1938, no claim to the contrary seems to have been made. If the contention of plaintiff is correct, then the action of the board and the court was either erroneous or in excess of jurisdiction. That is not a point easily determined nor need we do so in this case. If it was merely erroneous, no attack on the decree could be made in this collateral proceeding. Assuming that the decree should have been only for the amount claimed by the plaintiff, part of the initiated appropriation would have been left merely unadjudicated, subject to the right of applying it to beneficial use within a reasonable time, which right was specifically reserved to the company by the decree of the court of 1912 and which could not be taken away from it under the holding of Campbell vs. Wyoming Development Co., supra. The whole of the initiated appropriation of 633 cubic feet per second of time had been applied to beneficial use at the time the action was instituted as appears in the case at bar and in Campbell vs. Wyoming Development Co., supra, so that the rule stated by Weil, Water Rights (3rd Ed.), Section 480, (erroneously cited as page 476 in the Campbell case) should be applied herein, wherein the author states: "The tendency of decisions today is to figure beneficial use solely at the very time when any

controversy arises." That rule was applied by us in Campbell vs. Wyoming Development Co., supra. Hence, it is clear that plaintiff could receive no possible benefit from holding that the 633 cubic feet of water above mentioned was not finally adjudicated by the decree of 1912. It would be an idle proceeding to have another adjudication made at this time, and idle proceedings are not required by the courts. Furthermore, plaintiff has been guilty of laches and ought not to be permitted at this time to attack that decree.

Counsel for plaintiff further claim, as stated by them: "The conclusion is inescapable, we think, that before the water commissioner can act there must be a lawful adjudication of the rights of appropriators on a stream." We think counsel are in error on that point. If counsel were correct, then little distribution of water by the water commissioners could have been made prior to about the beginning of this century in view of the fact that comparatively few adjudications of water rights had been made by the Board of Control previously. The question as to whether or not distribution of water might be made pursuant to a permit arose in 1901, and the question was submitted to the Hon. J. A. Van Orsdel, Attorney General. He stated in his opinion (see State Engineer's Report for 1901 and 1902, page 50):

"I can distinguish no difference between the duty of a water commissioner or any officer in the distribution of water under an uncompleted permit and under a certificate of appropriation. The ditch for the conveyance of the water is the same is one case as the other, and the land to be irrigated is as specifically described in the one case as in the other. An appropriator of water under a certificate of appropriation has no more right to receive water, or deprive a prior appropriator of water that belongs to him, than an appropriator under an uncompleted permit. The duty of the water commissioner is to distribute water to

the appropriators in the order of their appropriations, and until the holder of a permit has forfeited his right by failure to comply with the prescribed condition, he is entitled to the same recognition as an appropriator holding a certificate of appropriation."

We see no reason why we should disagree with that opinion, and the rule would equally apply to an appropriator under the territorial law by posting notice, as was done by the Wyoming Development Company in the case at bar. It follows, of course, that even if part of the 633 cubic feet of water were considered to be still unadjudicated, plaintiff could not claim that the water commissioner, defendant in this case, deprived the plaintiff of any water by reason of the fact.

II.   Area and Capacity of Reservoir No. 2.

As above stated, the Board of Control held that the storage capacity of Reservoir No. 2 of the Wyoming Development Company is 98,934 acre feet of water and adjudicated the water right to that extent to the company. It is not contended that the reservoir as actually constructed does not have the foregoing capacity, but it is claimed that only 73,625 acre feet should have been awarded. It appears that application for Permit No. 1724 for Reservoir No. 2 was filed on January 29, 1898. Two other permits for the same reservoir seem to have been granted prior to that time but were displaced by Permit No. 1724. However, all the papers in connection with this reservoir were apparently kept together. One of these prior permits was numbered 1036, filed August 16, 1895. Aside from the map of 1901 made by G. W. Zorn, hereafter mentioned, only one map showing the elevations of Reservoir No. 2 was found among the papers, namely a map, plaintiff's Exhibit 3, made by Clarence T. Johnston in 1895, which states no area. Another map of Clarence T. Johnston, filed in the United States Land Office, was introduced in evidence

by the plaintiff as Exhibit 33. That map which, judging from the outside lines of the reservoir, is of the same area as Exhibit 3, states the area to be 5,060 acres. So counsel for the plaintiff draw the conclusion that the only map that may be considered as having been filed with the application for Permit No. 1724 is the Johnston map, and that since the statute (Sections 924 and 927, Rev. St. 1899) required the application for a permit to be accompanied by a map, the only water right which the permittee was able to obtain was to the extent as shown by the Johnston map, namely a reservoir right contained within the area of 5,060 acres. To strengthen this contention, plaintiff offered in evidence (not received) the statement of Elwood Mead, State Engineer, contained in his published report for 1897-1898, page 118, to the effect that Reservoir No. 2 could contain 78,000 acre feet of water by filling it to the depth of 15 or 20 feet. Attached is a map showing the area to be 5,060 acres, which is the same area as contained in one of the Johnston maps heretofore mentioned. There can, of course, be no doubt that the State Engineer, when he wrote his report in this connection, had in mind and had before him the Johnston map. Still the probative force thereof in litigation between private parties is somewhat conjectural and counsel have not enlightened us. The report is a voluminous document referring to hundreds of different matters. It is possible—perhaps not probable—that the portion of the report here in question was written in 1897, or that a later map was overlooked.

Original Permit No. 1724 contains a notation that a map was filed. Hence, the only question is what map. Defendants introduced in evidence a blue print of a map marked "Wyoming Development Company Reservoir No. 2, Albany County, Wyoming, 1897." On a corner of this map appears the following: "Per-

mit No. 1724, Wyo. Dev. Co. No. 2 Res., Book 8, Page 133." It states on its face "Area of Reservoir 6,630 acres. Capacity 126,000 acre feet" (which was later found to be too great). The map on its face appears to be an ancient document. There is no indication on it that it is of recent origin. We think the Board of Control and the District Court were justified in accepting it as having been made in 1897, just as it states. The area of the reservoir indicated by it is larger than that indicated by the Johnston map. It is not surprising, of course, that this map was not found among the files of Permit No. 1724, but only in the possession of the defendants, for duplicate maps were to be filed, one of the duplicates was to be returned to the appropriator, and this map may have been the one that was so returned. See Section 925 R. S. 1899, now Section 71-246 W. C. S. 1945. That no duplicate was found among the papers in the office of the State Engineer cannot, after so many years, be said to be conclusive, since it might have been withdrawn for some purpose or other. It is rather strange that the map filed with Permit 1724 should be a map made in 1895 rather than a map which was made later. Plaintiff's Exhibit 2, a map, while not containing any elevations, shows the location of Reservoir No. 2 together with the location of the dam across the river and also the lands of the Wyoming Development Company. It was found among the files of Permit No. 1724. The following endorsement is found thereon: "1724, Wyo. Dev. Co., Wyo. Dev. Co.'s No. 2. 133 8 app." That is an indication that duplicates of this map, too, had been filed in connection with the application for Permit No. 1724. Furthermore, a new map was made during the construction of the reservoir by G. W. Zorn. This map was filed in the office of the State Engineer on November 28, 1901. That map states on its face, "Area 6,690 acres. Capacity 120,420 feet." (later

430

found to be too great). We have compared this map with the map of 1897 and, as far as we can see, the outside lines of the reservoir on the two maps are the same. Again, the Zorn map contains the following endorsement by the State Engineer: "This plat showing the true and correct water line of the completed reservoir No. 2 was filed this 28th day of November, 1901. Approved: Fred Bond, State Engineer." A map made by Joseph A. Elliott was filed in connection with the proof, before the Board of Control, of the construction of the reservoir. It is based substantially on the Zorn map, but contains a table showing, as corrected by the State Engineer, the available capacity of the reservoir to be 98,933.75 acre feet of water.

It is doubtful that we can definitely say after the lapse of so many pears that no map except the Johnston map was filed with the application for Permit No. 1724. But let us, for the purposes of this case, assume that that map was the only one so filed and consider that assumption in the light of the fact that the reservoir was completed in 1901 or 1902 and the water applied to beneficial use (of which more anon); that the State Engineer approved the Zorn map; that none of plaintiff's rights were initiated prior to 1908, and that while the location of the reservoir is the same as shown on the Johnston map, its area has at most been somewhat extended and has a somewhat greater capacity. Section 924, Rev. St. 1899, (of which Section 71-245 W. C. S. 1945 is a revision) provided:

"Each application for permit to appropriate water for beneficial uses must be accompanied by a map or plat in duplicate, showing accurately the location and extent of the proposed work. * * * These maps or plats must show * * * the water line of the reservoir * * * the position and area of all reservoirs or basins intended to be created for the purpose of storing water," etc.

Counsel for plaintiff contend that the requirement of

the filing of a map is mandatory. That point is not important herein as noted hereafter. But counsel seem to contend further that no deviation from the map first filed will be permitted, but that it is mandatory to construct the reservoir according to that map; that no amendment can be made to any map or plans first filed, or different maps or plans filed, without making a new application for a permit. We have heretofore held that no water right may be initiated under our present laws except pursuant to a permit; that hence the requirement of such permit is mandatory. Wyoming Hereford Ranch vs. Hammond Packing Co., 33 Wyo. 14, 236 Pac. 764. We have not heretofore had occasion to pass upon a similar question in connection with maps and plans for irrigation works, and there seems to be a scarcity of decisions thereon. The subject as to whether or not a statute is mandatory is considered in 59 C. J. 1072-1075. On the latter page, it is stated:

"Some authorities have made the question to depend on the presence or absence of words declaring the effect of a failure to comply with the statute, holding that a statute which requires certain things to be done, or provides what result shall follow a failure to do them, is mandatory, but that if the statute does not declare what result shall follow a failure to do the required acts, it is directory."

In the case of De Haas vs. Benesch, 116 Colo. 344, 181 Pac. 2d 453, 457, the court stated:

"Water rights are not based on the filings of maps or statements. Such filings do not constitute appropriations nor lack thereof invalidate them. The statute, '35 C. S. A. c. 90, §27 et seq., providing that appropriators shall file map and statement nowhere declares such filings are essential to a valid appropriation; it declares only that a map and statement so filed shall be prima facie evidence in any court of intent to appropriate. * * * The purpose and effect of filing must not be extended beyond the statute."

The Colorado statute is as mandatory in form as the statute of Wyoming. While the method of initiation of a water right is somewhat different in this state than in Colorado, the cited case gives us a red light signal against construing our own statute too rigidly in connection with maps and plans. As shown in the citation from Corpus Juris, supra, we must consider the reason why they should be filed. The requirement thereof is doubtless, in the main, for administrative purposes on the part of public officials; in special cases, as for instance in the construction of a dam across the river, to protect the public. A similar idea is expressed by counsel for plaintiff when they state in their brief that the main objective of our water laws is to establish evidence of title and a record for use in the administration on the stream. The guardianship of these purposes is not in the hands of the plaintiff, but in the hands of duly constituted public officials. It may be admitted, for the purposes of this case, that the State Engineer would have had the right to object to an enlargement of the reservoir beyond that shown on the Johnston map. But it is difficult to see what right plaintiff has to raise objections in that connection unless it had a special interest therein and was harmed or injured. Thus, it is stated in 1 C. J. 982 and 1 C. J. S. 1073; "A private individual cannot maintain an action to enforce a right or redress a wrong of a public nature unless he has sustained some injury which is special and peculiar to himself." It is a fundamental rule of law that a private party has no right of action except in so far as his rights have been invaded and he is harmed or injured by such invasion. 1 C. J. S. 1005. We can conceive of a situation in which he might be harmed by a change in maps or plans. They may indicate the extent of the appropriation intended to be made by the party required to file them, and if a subsequent or junior appropriator

initiates an appropriation from the same source in reliance upon those that are filed, then a change therein should probably not be made to his detriment. That a subsequent appropriator has that much special interest may be granted, as opposed to or along with the public interest represented by the public authorities. But if the first appropriator, in the meantime and before a subsequent appropriation is initiated, changes his maps and plans and appropriates water in accordance therewith, with the approval of the State Engineer, as in the case at bar, then it is difficult to see how or why a special interest can be said to have arisen in favor of the subsequent appropriator—as an appropriator—in the original maps and plans, for we are unable to see how, in that case, he can be said to have been legally injured. In the case at bar, plaintiff, when it initiated its rights in 1908, had knowledge of the present area and capacity of the reservoir in question, not only by reason of the physical structure, but also by reason of the Zorn map approved by the State Engineer in the fall of 1901. It could not possibly have been deceived. It cannot be said that it initiated its rights on the strength of the Johnston map or that it was harmed by reason of any change. On the contrary, it is highly probable and natural that the plaintiff initiated its rights upon the strength of the actual physical structure and the Zorn map above mentioned, and this is borne out by the fact that it raised no question relating thereto until 1938. The change made by the Wyoming Development Company, if actually made, should, even if not strictly in accordance with the statute relating to maps, at most be considered as an irregularity of which the State Engineer, representing the public, might have complained, but the plaintiff, since it was a junior appropriator a number of years later, should not be able to take advantage thereof and thus subvert the funda-

mental rule of priority of appropriation of water, which, according to Section 71-250 W. C. S. 1945, dates from the time of the filing of the application for a permit in the office of the State Engineer. To give any other construction to our statute would, we think, be without good reason. A statute is made mandatory to subserve some really good purpose at the time when an act under it is done, and not to give a loophole for a technicality to someone who comes along later. Moreover, not even plaintiff contends that there was not at least a technical compliance with the statute applicable herein, for its counsel concede that at least the Johnston map was filed with the application for Permit No. 1724. Thus, there was a compliance with the strict letter of the law. It is contended, however, as stated before, that no deviation therefrom could be permitted, but the statutes applicable herein are wholly silent on that point. They contain no prohibition that amendments and changes in the map, in the plan, and in the irrigation works, may not be made during construction. We perceive no sound reason why we should feel at liberty to interpolate such prohibition therein, at least as applicable to changes that are not unreasonable, and are made with the approval of the State Engineer and prior to the time that another party initiates an appropriation from the same source. We have an administrative interpretation of our statutes by the State Engineer given 44 years ago that changes may be made during construction with the approval of the State Engineer, as shown by the following endorsement made on Permit No. 1724: "During construction it was found advisable to change the outlet to a point on the dam which bears N. 16½° E. 3150 feet from the S. W. corner of Sec. 31 T. 22 N. R. 73 W. Change approved: Clarence T. Johnston, State Engineer. December 7th, 1904." Section 71-313 W. C. S. 1945, which was Section 932 of the Rev.

St. of 1899, provides that the State Engineer may, during construction, "order the parties constructing such dam or other works to make any addition or alteration which he considers necessary for the security of the work or the safety of any person or persons residing on or owning land in the vicinity of such works." This does not refer to the area of a reservoir, but it goes far in showing that changes in irrigation works may be made during construction without filing a new application for a permit. In fact, it is doubtful that many, if any, large irrigation works are constructed exactly according to original maps or plans.

Counsel for plaintiff, perhaps, will claim that what has been heretofore stated is inconsistent with what was said in Big Horn Power Co. vs. State, 23 Wyo. 271, 148 Pac. 1110. We think, however, that the case is clearly distinguishable. In that case, the court had under consideration Section 71-312 W. C. S. 1945, reading as follows:

"Duplicate plans for any diversion dam across the channel of a running stream, above five (5) feet in height, or of any other diversion dam intended to retain water above ten (10) feet in height, shall be submitted to the State Engineer for his approval, and it shall be unlawful to construct such diversion dam until the said plans have been approved."

The court stated, among other things:

"It will be observed that the approval of the plan by the state engineer, under section 825, (the same as Section 71-312 W. C. S. 1945) was a condition precedent to the construction of the dam; and, unless so approved, it would, by the terms of the section, be unlawful to construct it. The statute does not provide for the approval of the plan after the construction as precedent authority or otherwise for building it."

That statement seems inconsistent with part of what has been stated above. However, it is stated in 59

C. J. 1072 that: "a statute may be mandatory in some respects, and directory in others." In the foregoing case, the court had under consideration the so-called Boysen Dam across Big Horn River, constructed not for irrigation purposes, but for power purposes. The action was brought by the State to declare part of the dam as a nuisance and it was held to be such. After the dam was constructed, in violation of the permit, granted only after an extensive hearing, an amended plan was submitted to the State Engineer. It was marked approved by him. There was evidence to the effect that the approval was given simply to complete the records in the office of the State Engineer. That presents a feature entirely different from the case at bar. In any event, the State Engineer had no authority to give approval to a nuisance, and the language of the court heretofore quoted must be construed in that light. If the dam in question in the case at bar were a nuisance so as, for example, to endanger the property of the plaintiff, it would then have a special interest which it doubtless would have a right to protect. But no claim of that kind is made herein. Plaintiff's interest herein is merely that of a subsequent or junior appropriator of water.

To be added to what has heretofore been said is, of course, the fact that a half century has passed since the application for Permit No. 1724 was filed. Forty years had passed when the action for a declaratory judgment herein was commenced. Hundreds of rights by farmers had been acquired in the meantime under the appropriation made by the Wyoming Development Company, doubtless, as is natural, in reliance upon the fact that the proceedings in connection with the reservoir were regular. See Anderson vs. Wyoming Development Co., 60 Wyo. 417, 154 Pac. 2d 318. Taking all of the foregoing facts into consideration, we think that we are not warranted in upholding the con-

tentions of counsel for the plaintiff herein as above mentioned.

III.  Dams across Laramie River.

A.  Reservoir Dam.

Counsel for plaintiff state in their brief that "the only dam approved and for which a permit was granted was the dam in the Johnston survey," which appears to be one that is thirty feet in height. The dam actually constructed was 35 feet in height, five feet of which is called "freeboard" in the record, which we understand from the statement of Mr. Zorn to mean a protective structure, and not a structure to increase the amount of water available under the Johnston map. But, objecting to the "freeboard", counsel say that "the amount of usable water * * * was such an amount as could safely be stored by a dam 30 feet high, and that would mean a safety margin would require that water be stored at less eleva· tion than the top of the dam, otherwise the top of the dam would be washed out." True, if the Johnston map contemplated that. But we are not at all sure, taking all the facts in the case into consideration, that that was in contemplation. Even Elwood Mead, in his published report, evinced uncertainty in that connection, for he spoke of storing water to the depth of 15 *or* 20 feet. There is considerable difference in whether the water would be stored at one or the other of these depths. But, if we concede counsel's contention, then what we have said as to changes during construction should apply. Three more feet of "freeboard" were added subsequently to strengthen the dam, but this did not, according to the witness Zorn, in any way increase the capacity of the reservoir.

Counsel for plaintiff argue that Section 71-312 W. C. S. 1945, heretofore set out in full, requires that

duplicate plans for any diversion dam across a channel or running stream above five feet in height or any other dam intended to retain water above ten feet in height shall be submitted to the State Engineer for his approval and it shall be unlawful to construct such diversion dam until the plans have been approved. They contend that there was no compliance with that statute, and that this is fatal. We have already heretofore shown that plaintiff is not the guardian of, and has no right to enforce, the public purposes stated in our statute, unless it has a special interest therein, and that it, as a subsequent appropriator, can have a special interest only in maps and plans upon the strength of which it initiated its appropriation, assuming that irrigation works, constructed by an earlier appropriator from the same source, had the approval of the State Engineer. Moreover, while these statutes require the submission of plans on the part of applicants, it is no less the duty of the State Engineer to exact them. The law by reason of his superior or supposedly superior knowledge casts upon him, in the very nature of things, the burden to enforce the administrative features of the law. The presumption is that he has performed his duties. 31 C. J. S. 799; 67 C. J. 1060, under "Waters". And that presumption is heightened in the case at bar, since Permit No. 1724 above mentioned was approved by Elwood Mead, State Engineer, who is said to have been the father of the water laws of this state. We think that, after the lapse of so many years, that presumption should be applied herein. We do not think that there is sufficient evidence in the record to overcome it. And there are some facts in the record which support it. On December 20, 1901, the State Engineer, Fred Bond, made the following certificate:

"I, FRED BOND, do hereby certify that I am the State Engineer of the State of Wyoming; that the Wyoming

Development Company, a corporation organized and existing under and by virtue of the laws of the State of Wyoming, has regularly submitted its plans and purposes for the construction of its reservoir No. 2, including a map of the amended definite location, and its proof of completion of the said reservoir, all of which have been approved by this office to be in accordance with the laws and customs governing the use of water in the State of Wyoming."

There were among the papers in connection with Permit No. 1724 plans of the reservoir made by Mr. Zorn during construction, and it may be that the foregoing certificate meant to refer only to them, but it is broad enough to include previous plans. Mr. Bishop, State Engineer, testified that the procedure followed by the Wyoming Development Company in connection with Permit No. 1724 was in conformity with the regular and legal procedure according to the statutes and the rules of the office of the State Engineer. While this is more or less a legal conclusion, it at least shows the administrative interpretation of the statutes, to which the courts give at least some weight. It is not surprising that some of the documents relating to so large an appropriation of water as was made by the Wyoming Development Company should, after so many years, be found wanting, for the record shows, and we know, that there has been much litigation between Wyoming and Colorado, and between Wyoming and Nebraska, necessitating the withdrawal of documents from the office of the State Engineer, and the testimony shows that documents in fact have been withdrawn from the office for the purpose of being used in connection with such litigation. We hardly need mention the lack of zest of many attorneys as well as of others to return books and documents which have once come into their hands.

B. Diversion Dam.

Plaintiffs, in their brief, state that the Wyoming

Development Company "has constructed a dam in the river ten feet in height at the tunnel without obtaining a permit and enlarged the tunnel and ditch diverting water from the dam to the tunnel, all without application for a permit or permit." This statement speaks of a dam, a ditch and a tunnel. Nowhere in the record, so far as we are able to find, has this matter been explained. Judging from the maps which we have examined and taking into consideration the foregoing statement and the testimony of the witness Dodge, we surmise the facts to be as follows: The Wyoming Development Company constructed two dams across Laramie River, one of which—further up in the river—has heretofore been discussed and which we have called the reservoir dam. The water of the defendant companies, both that by direct flow as well as the reservoir water, leaves this dam and reservoir through a spillway, traveling along and down the bed of the Laramie River northerly and northeasterly for a number of miles until it arrives at another dam which we shall call the diversion dam. The water of the defendant companies then, partly at least by reason of the diversion dam, leaves the river through a ditch, thence travels through a tunnel and is thrown into the bed of Blue Grass Creek, traveling along the channels of that creek and other channels in a general northeasterly direction into Platte County. While the statement of counsel for plaintiff above speaks of a dam *at* the tunnel, the subsequent statement seems to show that the water is taken into a ditch before it arrives at the tunnel. Plaintiff attempted to prove that the tunnel was enlarged about 1910. It introduced in evidence an extract from the testimony of Joseph Elliott given in the case of The State of Wyoming vs. The State of Colorado, decided in the Supreme Court of the United States, in which he states something about an increase in the depth in the tunnel having

been made. That evidence is of no value in this case for the reason that no time whatever is specified as to when that work may have been done. The witness Dodge stated that he saw some work done on the tunnel in 1910 or 1911, and assumed that the tunnel was enlarged, and thought that work was done on the intake ditch to the tunnel. The witness further stated that the diversion dam was constructed after the work was done on the tunnel and that it is twelve to fifteen feet high. It is in view of this testimony that counsel for plaintiff claim that a "permit" for that dam should have been obtained. The dam was not built, of course, in order to appropriate water, so that the argument could not apply to a "permit" in the sense in which that term is used in connection with appropriation of water. They doubtless refer to Section 71-312 W. C. S. 1945 heretofore quoted in full, which provides for the filing of plans and the approval (permit?) thereof before a dam across a river is built which is more than five feet in height. Unless we have overlooked part of the record, there is no evidence that such plans were not filed and were not approved. Mr. Lloyd merely testified that he "wouldn't say that there was no 'permit' " issued in that connection. These plans would not be directly connected with Permit No. 1724 so that they would not, necessarily at least, be found in the files and papers connected with that permit. Howsoever that may be, the plans should, of course, have been filed, and if in fact they were not, the Wyoming Development Company was remiss in its duty. Still the enforcement of that duty was in the hands of the State Engineer or the State as in Big Horn Power Co. vs. State, supra, unless the plaintiff had a special interest therein which was injured or harmed. Counsel have not pointed out any injury or harm to plaintiff. All they say on the point is contained in

their statement hereinabove quoted. We think that absence of harm appears affirmatively.

As early as 1903, as already stated, the Board of Control awarded to the Wyoming Development Company 633 cubic feet of water per second of time by direct flow from Laramie River. It necessarily must have found that the ditch and the tunnel at that time had sufficient capacity to carry that amount of water, and was a proper method to divert it from the river. The District Court decree of 1912 heretofore mentioned, affirming the order of the Board on appeal, (see Campbell vs. Wyoming Development Co., supra) held that the carrying capacity was even greater. The reservoir water of the defendant companies is, of course, used only when there is not sufficient direct flow. Hence, we may assume, we think, that at least as early as 1903, the carrying capacity of the ditch and tunnel was sufficient to carry that water also. Whatever work was done in connection with diversion works in 1910 or 1911 must be construed in the light of the foregoing facts. It would seem to be clear that before we could say that the plaintiff was harmed by any change, it must be made to appear that the diversion works prior to the change were not sufficient to divert and carry the water of the defendant companies. But, as already stated, the contrary appears to be true. While there is no evidence why the changes were made —and by reason of deaths no evidence could be obtained on that point at the time of the trial—we may surmise that the defendant companies, in 1910 or 1911, figured that the method of diversion of the water was not the best. Mud, dirt and other material would naturally accumulate in the ditch and tunnel from time to time, and they wanted to be sure that no sufficient obstruction should exist in the future to hinder them from obtaining all the water to which they were entitled. Hence, they determined to make a permanent

improvement in the diversion works, deepen the ditch and tunnel, and construct the diversion dam. We have been unable to conjecture why an improvement in diversion works, the same as in anything else, may not be made from time to time as the advisability or necessity therefor arises, provided, of course, that the appropriator takes no greater amount of water than that to which he was previously entitled. There is no evidence that any such greater amount was taken after the changes mentioned were made, and we are unable to say, accordingly, that the plaintiff was injured or harmed.

IV.  Default in commencing construction.

Permit No. 1724 was approved on February 1, 1898. A year was given to commence the construction of the reservoir.  Plaintiff contends that the construction was not commenced within one year and that this is fatal and made the permit void; that while apparently some expenses were incurred in 1898, the amount is not substantial.  We are cited to the law as it existed at that time, namely Section 922, Revised Statutes of 1899, reading as follows:

"In his endorsement of approval on any application, the state engineer shall require that actual construction work shall begin within one year from the date of such approval, and that the construction of any proposed irrigation work shall be completed within a period of five years from the date of such approval. He may limit the applicant to a less period of time for the completion of work than is asked for, and likewise, the perfecting of the proposed right for a less period than named in the application.  The state engineer shall have authority for good cause shown, to extend the time within which irrigation or other works shall be completed under any permit therefor issued by said engineer."

It may be noted that this statute, while permitting an extension of the time of the completion of the work and applying the water to a beneficial use, is silent on

the point in connection with the commencement of the construction work. The main authority relied upon by plaintiff is the case of Morse vs. Gold Beach Water, Light & Power Co., 160 Ore. 301, 84 Pac. 2d 113, in which the court construed a section of the Oregon statute similar to Section 922 supra. It held the first part of the section to be mandatory and that the construction directed to be commenced within one year must be substantial in character, so as to manifest good faith and the intent to exercise reasonable diligence in the completion of the project. We do not consider the case as controlling herein. It did not involve forfeiture of any substantial property-right. The permit was granted in 1930. Nothing was attempted to be done under it until 1935. Then the plaintiff promptly intervened, complained to the State Engineer, who, after a hearing, revoked the permit and his action was upheld by the supreme court. The case at bar presents facts vastly different. Judging from the climatic conditions in this region, it was probably impractical to do any work on the reservoir from February 1, 1899 to June 1, 1899. On or about the latter date, G. W. Zorn was employed to superintend and manage the construction of the work. The record indicates, according to the books of the Wyoming Development Company, that the expenditures on the reservoir commencing with 1898 were as follows: In 1898, $77.80; in 1899, $7,992.70; in 1900, $55,886.63; in 1901, $49,330.59; a total during these years of $113,287.22. It is, of course, not surprising that no better evidence as to what was done in 1898 could be obtained than that here mentioned. G. W. Zorn when he testified in the case was 78 years of age. All other persons who had had anything of any substantial nature to do with the reservoir during its construction had probably died. Instead of plaintiff or anyone else objecting promptly to the work to be done

on the reservoir as was done in the Oregon case, supra, 39 years had passed before anyone claimed that the work had not been commenced as prescribed by the State Engineer, and, at that time, the structure had stood completed for about 37 years. The sum of $77.30 expended on the reservoir in 1898 is,of course, a small amount. It may, however, be that part of the expenses paid in 1899 were in fact incurred in 1898. Forfeitures are not favored. Ramsay vs. Gottsche, 51 Wyo. 516, 69 Pac. 2d 535. In Pool vs. Utah County Light & Power Co., 36 Utah 508, 105 Pac. 289, 291, the court stated:

"When, therefore, a forfeiture of a pre-existing right is claimed by reason that a particular clause or section of an entire act has not been literally complied with, and when the statute does not in terms or by unavoidable implication declare that the failure of a strict compliance shall work a forfeiture, the courts may well pause before declaring a forfeiture by reason that all the provisions of the act have not been literally complied with."

To the same effect, see In Re Rights to Use of Water of White River, 141 Ore. 504, 16 Pac. 2d 1109, 1113. In the case at bar, Section 922, supra, does not provide that the failure to commence the work within one year after the permit has been granted shall work a forfeiture of the permit. Moreover, we shall indulge in every reasonable presumption after the expiration of so many years. Plaintiff, after the expiration of half a century, now asks us to say that because of a possibly slight default in commencing the construction of the work here in question, the foregoing $113,287.22 —and probably thousands of dollars paid in the meantime—were spent in vain and that no rights were acquired by reason thereof. We think plaintiff is too late. Its demand is so extraordinary, if not shocking, that no court of equity, we think, would give it its sanction.

V.   Digging channels between basins.

The capacity of Reservoir No. 2 here in question as adjudicated is, as already stated, 98,934 acre feet. Its area is 6,690 feet.   Dividing the capacity by the area, we find that the average depth of the water in the reservoir, if completely filled, would be approximately 14.8 feet.   That is the average and is based upon the assumption that the bottom of the reservoir is level.   It appears, however, that it is not level. There appear to be three different basins, called lakes in one or two of the maps, in the reservoir extending southwesterly and northeasterly, depressions deeper than the surrounding terrain and separated from each other by a considerable distance of ground so that unless they are connected by channels not all of the water in the reservoir can be utilized.   It was estimated by the witness Zorn that some 21,000 to 25,000 acre feet of water would not be available if those channels were not cut.   The maps in evidence in the case do not show any channels dug between these basins or lakes except the map submitted to the Board of Control by Joseph Elliott in 1939.   It is contended by the plaintiff that these channels were not dug to the depth (of 10 or 11 feet) as they were at the time of the adjudication until about 1931.   The conclusions which counsel for the plaintiff draw from these facts and the contentions based thereon are, firstly, that since the maps until the Elliott map do not show any method of withdrawing the water from the basins, no water could be said to be acquired by the appropriation except the water available without digging the channels; secondly, (to use the words of counsel) that "since digging these channels resulted in an increased capacity of available water, we think it is impossible to escape the conclusion that such construction constituted an enlargement of the reservoir, and, since no application was

made to construct such enlargement, no right could be acquired thereby."

We cannot sustain the first of these contentions. While perhaps it would have been advisable to have shown these channels on the map used during construction, it would be a violent supposition that the Wyoming Development Company intended to leave some 21,000 to 25,000 acre feet of dead water in the reservoir which could never be utilized. We think that the applicant intended, as any irrigator naturally would, to construct the reservoir so as to be able to draw off all the water, and the witness G. W. Zorn in fact testified to that effect. Hence, the construction of the channels between the basins must be considered as an integral part of the construction as a whole, known to be such whether shown on the map or not. No irrigator, it would seem, would think differently. Counsel have not cited us to any statute or to any other authority requiring these channels to be shown on the maps, although it may be that the State Engineer would nowadays, after years of experience, require them to be shown, but it is hardly fair to judge the standards of half a century ago by the standards of today.

The testimony on the second of the foregoing contentions is, aside from affidavits submitted to the Board of Control, rather meager, which is not surprising in view of the long lapse of time and the death of most parties who had anything to do with the construction of the reservoir. The witness Dodge saw work done on the channels a number of times but did not know whether that work consisted merely of cleaning them or deepening them. The witness L. J. Holliday testified that he talked with Joseph A. Elliott, manager of the Wyoming Development Company, in 1931, and that the latter stated that he had equipment for lowering the channels, and that he had been working on them

for a number of years, and that during the season he would get them for the first time down to the level of the bottom of the gates. Mr. Elliott had died when this testimony was given, so that he was unable to contradict or explain the conversation. The court probably disregarded the testimony as, under the circumstances at least, it had the right to do. The witness Zorn testified that channels were dug to the depth of two feet during 1901 on the theory that the water would scour the channels out and form a natural channel without requiring any special work. The actual result does not appear. M. R. Johnston was the manager of the Wyoming Development Company during that time. He gave testimony in the litigation between Wyoming and Colorado which was carried to the Supreme Court of the United States in 1916. An extract from that testimony is contained in the record before us. He stated, among other things, that the company worked on the channels in the fall of 1902 and 1903. He does not specifically state whether or not this work constituted a mere cleaning out of the channels or whether they were dug deeper at that time. Assuming that the work done in 1902 was to cut the channels deeper, this work was probably done before December 1, 1902, the time given by the State Engineer for completing the reservoir, and the mere fact that Mr. Zorn, in the fall of 1901, reported the reservoir completed is immaterial. Mr. Johnston further stated: "The water in the reservoir was all drawn off during these years." That would indicate that the channels were deep enough at that time, and the inference is not unreasonable that the water was actually used for beneficial purposes. Looking at the situation from that standpoint, the conclusion would seem to be that, during these years, the appropriation of water through the reservoir was complete in all of its phases, and it would seem that, in that event, the case revolves itself

upon the point as to whether or not there was a subsequent abandonment of any of the water of the reservoir. The burden of proving abandonment rests upon the plaintiff in this case and, as already stated, forfeitures are not favored. Ramsey vs. Gottsche, 51 Wyo. 516, 69 Pac. 2d 535. There is no evidence in this case or at least not sufficient evidence to show abandonment of any of the water of the reservoir, and the foregoing contention accordingly cannot be sustained.

VI. Jurisdiction of the Board of Control.

Counsel for plaintiff say in their brief: "With respect to the adjudication by the State Board of Control, we call attention to the fact that this action (for a declaratory judgment) was begun in July, 1938. The proof of construction which the board intended to adjudicate was not filed in the State Engineer's Office until March, 1939, after the court, in the first action, acquired jurisdiction to determine that very issue." Standing by itself, we would hardly know what is the contention that counsel make, and we should not, perhaps, say anything on that point. But we shall briefly say something. Referring to the appeal taken by plaintiff from the adjudication of the Board of Control, the contention seems to be that, in view of the fact that the court in the action brought in 1938 acquired jurisdiction to determine the relative priorities of the parties, the Board of Control thereafter had no jurisdiction in the matter. That contention is possibly based on the theory that a principle analogous to that stated, for example in 14 Am. Jur. 435, should be applied. There it is stated: "It is a familiar principle that when a court of competent jurisdiction acquires jurisdiction of the subject matter of a case, its authority continues * * * until the matter is finally and completely disposed of, and that no court of coordinate authority is at liberty to interfere with its action."

But the Board of Control is not a court. It is an administrative body with quasi judicial power. By and large, it is an aide to the courts in administering justice in cases involving water rights, since it may adjudicate such rights, but from whose decisions an appeal may be taken to the courts. We held in Simmons vs. Ramsbottom, 51 Wyo. 419, 68 Pac. 2d 153, that the right of the Board of Control to adjudicate water rights is not exclusive, but that such rights may be adjudicated by the courts in cases in which that has not been done by the Board of Control. The question before us here was not, however, involved in that case. But a not dissimilar point arose in the case of Crawford vs. Hathaway, 67 Neb. 325, 93 N. W. 781. There is a board in Nebraska similar to the Board of Control in this state, and in the creation of which the legislature of Nebraska followed the Wyoming laws, as stated in the foregoing case. Weil on Water Rights (3rd Ed.), page 1106 refers to the foregoing case, and states that while it was held that courts have the right to adjudicate water rights, it was also held "that it is within the discretion of the court to remand the parties to their remedies by application to the board. See 93 N. W. 793. There is good reason for that. Irrigation matters frequently involve many technicalities in connection with which courts cannot be expected to be experts, while the members of the Board of Control supposedly are. Now, if the trial court would have had the right to ask the parties to go and have the matters of priorities first determined by the Board of Control, there would be no reason to hold that the parties may not themselves initiate proceedings before it, at least in the absence of the court's objection, if, in the meantime, the action brought in court has not been finally determined, as is true in this case. In other words, we can find no good reason why the court may not avail itself of the aid which may be furnished

by having a previous adjudication of the right made by the Board of Control, just as it might refer a case to a referee, and that is in substance the situation in this case.

We have examined all the points argued by counsel for plaintiff in their brief with the utmost care. It is possible that the Wyoming Development Company was remiss in some of the matters pertaining to the reservoir, but so far as we can see not in matters of substance by which the plaintiff could in any way be harmed. The company did not, it is true, submit its proof for adjudication of the reservoir right within the time prescribed by Section 71-243 W. C. S. 1945. But there was no law to that effect until the enactment of Chapter 119 of the Session Laws of 1917. And Section 71-243 applies an entirely different equity in cases of default than counsel for the plaintiff want us to apply in the case at bar. Notice of default must first be given, before any forfeiture can be invoked, and no notice of default has been given, so far as the record shows. We find no prejudicial error in the record, and the judgments herein must accordingly be *affirmed*.

RINER, C. J. and KIMBALL, J. concur.