**LARAMIE RIVERS COMPANY, a Wyoming Corporation, Appellant (Plaintiff below),**

**v.**

**CARROLL AND CARROLL, INC., a Wyoming Corporation, et al., Appellees (Defendants below).**

**No. 4256.**

Supreme Court of Wyoming.

Dec. 12, 1974.

David N. Hitchcock, Laramie, for appellant.

George J. Millett, Pence & Millett, Laramie, for appellees.

Before PARKER, C. J., and GUTHRIE and McCLINTOCK, JJ.

Mr. Justice McCLINTOCK delivered the opinion of the court.

Laramie Rivers Company[1] appeals the decision of the district court of Albany County, Wyoming, entered January 21, 1973, dismissing its action against Howard T. Carroll and others. Plaintiff sought recovery from the defendants of assessments for operation and maintenance charges on a reservoir and canal system in Albany County, Wyoming for the years 1962, 1963, and 1969.[2] Recovery was sought on some 17 separate contracts, one of which involves the defendant Howard T. Carroll personally, the other 16 pertaining only to the corporation. The district court, after trial without a jury, found generally in favor of the defendants on both counts of the complaint and on the first count found specially that Carroll had executed a quitclaim deed for 129.44 water rights in extinguishment of all past due assessments under that particular contract.[3] Upon the second claim, involving the other 16 con-

1. Hereinafter referred to as plaintiff, which designation shall include Laramie Water Company, predecessor in interest and which was the contracting party on most of the contracts.

2. The record shows that some water was available under plaintiff's appropriation in the years 1962 and 1963 but that there was none in the years 1964 to 1969 inclusive. No assessments were levied in any of the years 1964 to 1968, but the 1969 assessment specifically included expenses of the plaintiff in all of these years.

3. Notwithstanding this finding the record seems clear that this contract represented 200 water rights, that is, water rights for 200 acres. There would logically be a release of the contract only as to that part of the water right which was quitclaimed. However, under the view we take of the case this discrepancy is unimportant.

tracts, in addition to finding that any action as to the 1962 assessment was barred by the statute of limitations and laches, the district court also found that except for 160 acres as to which the defendant company had received water in 1962 and 1963 and paid the assessments therefor, the defendant company

> "received no other water *during the years in question* and water was not delivered to the required place for use by the Defendant, and Plaintiff breached its obligation to provide a canal or lateral 'suitable for the delivery of water to the purchasers' as required, and Defendant is not, therefore, liable for the assessments." [Emphasis supplied.[4]]

The action was thereupon dismissed as to all parties and this appeal followed.

Plaintiff is apparently an ordinary business corporation, organized for profit, whose stock is owned independently of the ownership of water rights.[5] The claim for assessments is based on separate contracts between plaintiff's predecessor and various landowners, which lands are now owned by the defendants.[6] These agreements, entitled "Water Right Contract and Mortgage", but in some instances with the mortgage provisions eliminated, in pertinent part constitute a grant of a water right by plaintiff or its predecessor to a named person for use upon particularly described lands presumably owned by such water user. The water right so granted is the right to participate in a proportionate way in the use of the Laramie Rivers Water System and the water appropriation connected with it, but which right shall not exceed one acre foot of water per acre per annum. It is expressly provided that plaintiff shall not be liable for any short-

age of water for any cause except its own wilful default or neglect. The agreement contains special provisions as to the manner in which water shall be delivered to the user to which we shall make more specific reference. Section 6 of the contract provides that the company shall as soon after March 1 as is convenient estimate the probable expense of maintaining, repairing, operating, and administering the system and apportion such expenses among all the water rights of the system, ten days notice of which shall be given, which charges shall be due and payable on or before April 1 of each year.

> " * * * Each holder of water rights shall be liable for the payment of such assessments, together with the legal rate of interest thereon from the date when the same shall become payable, and such payment may be enforced by suit or by shutting off the supply of water until such payment may be made, or by any other lawful remedy, which remedies may be exercised successively or concurrently at the option of the Company. Any excess or deficiency which shall appear to have arisen in the estimate for any year may be compensated in the estimate of any succeeding years."

As to the years 1962 and 1963, plaintiff claims that delivery of water was made within the terms of the agreement. This is disputed by the defendants and the testimony of Carroll is that, except as to one right which was paid for on an experimental basis, that is, to see if water could be delivered to the lands covered by the right, no water was delivered to him or to his company. Plaintiff cites the testimony and opinion of a civil engineer presented at the trial in 1971, that it would not have been a

---

4. We interpret the italicized phrase to refer to 1962, 1963, and 1969.

5. A more complete discussion of the history and nature of Laramie Rivers Company and its predecessor, Laramie Water Company, is set forth in Laramie Rivers Company v. Watson (1952), 69 Wyo. 333, 241 P.2d 1080, and State v. Laramie Rivers Co. (1943), 59 Wyo. 9, 136 P.2d 487.

6. Defendants themselves did not sign any of the contracts and no special reference thereto is found in any conveyance to them. We accept as a premise of this opinion that the water rights represented by the contracts became and passed as appurtenances of the lands.

very expensive job to get the ditch into shape so that water could have been delivered in 1962 and 1963, and argues that if defendants had paid their assessments, water could have been delivered. The opinion of this witness appears to conflict with the view of a long-time officer and manager of the company, expressed to Carroll in 1962, that it would cost a considerable amount of money which the company did not have to get the system into shape to deliver water to Carroll. It may be that the conflict reflects a difference in the quality of work contemplated by the two men.

It is not controverted that in 1962 and 1963 there was some water available in the reservoir and that some of this was transmitted into the canal system, but it is likewise not denied that in those years, except as to one water contract on which the assessments were paid, no water was actually received by either the individual or corporate defendants. Plaintiff's counsel in his brief outlines the location of the canals and their proximity to the lands of the defendants, and as to Carroll personally (defendant as to the first claim only) it is claimed that since the canal passes within less than a quarter-mile of his land, "there is no question that plaintiff 'did provide a canal or lateral extending to a point within one-half mile of the boundary of said land * * * suitable for the delivery of water to the Purchaser' ".

Plaintiff argues that this is a complete satisfaction of its obligation in view of the further provision of the contract that the purchaser "shall, at his own cost and expense, provide and maintain any laterals or other works which may be needful to convey the water from the Company's canal or lateral to, over and upon said lands". It is contended that the state of repair of the flume necessary to divert the water from the canal in to Carroll's ditch is unimportant because however the flume may have been installed originally there was no obligation of any kind on plaintiff to maintain

and repair it within one-half mile of Carroll's lands, since this is said to be unquestionably a part of the "other works" which the purchaser was required at his own cost and expense to provide and maintain under provisions of the contract.

■ Water may pass through a ditch or canal in close horizontal proximity to a parcel of land but unless a diversion works is installed at that point the water flowing in the canal is of no value to the intended user. We believe that a canal "suitable for delivery of water" must necessarily include those installations necessary to take the water from the canal in a practicable manner. We also think that the obligation to install and maintain such installations is imposed upon the plaintiff by those provisions of section 5 of the contract not mentioned by plaintiff and which provide that

"water delivered to Purchaser shall be measured by means of a suitable weir or other device to be selected, installed and maintained by the Company at the point where such water is to be delivered to the Purchaser."

The further fact that the contract in clear language forbids the user from in any manner tampering with this part of the irrigation works permits no other conclusion than that the continuing maintenance of devices whereby the water is taken from the canal and delivered to the user's lateral is the sole responsibility of the plaintiff.

■ As to the years 1962 and 1963 we therefore conclude that the trial court was justified in finding, as it specifically found on the second count and within the general finding [7] pertinent to both the first and second counts, that water was not delivered to the required points, and that plaintiff thereby breached its obligation to provide a canal or lateral suitable for delivery of water to the purchasers as required. We believe that this finding is supported by substantial evidence and the disposition of this action is then governed by McHale

---

7. Such finding "constituted a finding of every special thing necessary to sustain the judgment". Schmidt v. Foster, Wyo., 380 P.2d 124, 126 (1963).

v. Goshen Ditch Company, 49 Wyo. 100, 52 P.2d 678 (1935).

In that case Goshen Ditch Company, whose stock was owned by persons whose lands lay along the company's irrigation system, had by its contract and stock certificates sold to those stockholder-water users a perpetual water right, the obligations being that the company would deliver water and the stockholder would pay a proportionate amount of the cost of such delivery. In that case as in this the assessments were to be made and became payable early in each year before the irrigation season started. Assessments for the years 1925 through 1932 were not paid but because of the condition of the ditch no water was delivered or could be delivered.

This Court construed the agreement as containing reciprocal obligations and held that the company could not recover without performance on its part. Quoting the rule that "in order that either party to a contract may be able to sue the other, each must show performance or tender of performance", citing 13 C.J. 627, 662, and an earlier California case holding that a canal company was entitled to recover for water from the time it was prepared to furnish it, this Court stated as the converse proposition, "that if the ditch company was not prepared to furnish it, it would not be in a position to recover. One of the parties to a contract cannot exact of the other party performance when he himself cannot perform", or as otherwise stated, in order for one of the parties to sue for the other's default "he must be ready, able and willing to perform his part of the contract". Cases cited in support of this statement include Browning v. North Missouri Central Ry. Co. (Mo.Sup.1916), 188 S.W. 143, 149, holding that readiness and ability to perform "are conditions precedent to the right of either party to maintain an action for the default of the other, and until they are complied with the default is mutual and unactionable". 52 P.2d at 680.

Plaintiff's attempt to distinguish McHale on the basis that in that case the court refused collection of assessments for water which could not have been delivered while in this case plaintiff seeks collection of assessments which would have provided the necessary funds to assure delivery of the water, does not impress us because in McHale it was expressly stated that the main difficulty in the case was the lack of money. "Plaintiff's assessment for the current year would have helped." 52 P.2d at 683. Nor do we think the case can be distinguished on the ground that in that case water had never reached the water user's lands. As we have said, the obligation to provide a canal suitable for the delivery of water included the installation and maintenance of a proper means of delivery.

We have no difficulty then in concluding that denial of recovery of assessments for the years 1962 and 1963 was proper. However, plaintiff further contends that the principles applied in McHale cannot govern the disposition of this case and the right of plaintiff to collect the 1969 assessment because all of the expenses for the years 1964 through 1969, combined in one assessment in 1969, represented expenses which had to be paid whether or not there was water available for the system. It is argued that since no water was available to this appropriation in any of those six years it was immaterial whether or not the canals were in condition to deliver water.

Conceding that the operation of an irrigation system for the diversion, storage, and transportation of water involves some expense whether or not water is available, we do not think that plaintiff, not having performed or tendered performance in any respect, should be excused from such nonperformance and at the same time the water users be held to performance of their undertakings. Under the findings of the trial court, well substantiated by the evidence, the defects in the delivery system which existed in 1962 and 1963 were not corrected in the subsequent years and plaintiff was no more capable of delivering water in the later years than it had been previously. It seems clear from the record

that the condition of the system, at least in the vicinity of defendants' lands, has steadily deteriorated over the years, and to hold these water users liable for assessments under such circumstances would be to hold them to their covenants while excusing plaintiff from performance on its part.

To permit such recovery by the plaintiff, without a showing of performance or tender of performance would be an express rejection of the above quoted rule from *Browning,* approved by us in *McHale,* that in order to show performance or offer to perform "he must show his readiness and ability to perform at the appointed time and place". Counsel's argument that all parties to the contract understood that in each year there would be expense of maintaining, repairing, operating, and administering the system which would ultimately have to be paid by the water right holders does not obviate this requirement. That the purchasers contemplated the assessment of expenses of administering the system, including taxes, may be a valid assumption but it does not follow that plaintiff must be permitted to recover when it cannot itself perform.

■ Whether the nondelivery of water results from failure to maintain the system or from the lack of priority of the water right, the fact remains that the contract purchasers did not get what they bargained for. *McHale* and the cases cited therein do not predicate the denial of recovery to one who cannot himself perform on that party's unwillingness alone. Inability to perform, for whatever reason and however good the reason, does not convert the promise to pay assessments into an independent covenant.

■ Plaintiff *promised* that if water was available it would deliver it to the water user's point of diversion. It did not *promise* that if no water was available to it under its priority it would nevertheless deliver water and in fact it expressly disclaimed liability in that respect. But under the principle of dependent or concurrent conditions approved in *McHale* the ability

to deliver and delivery of water are a limiting condition upon the obligation of the water user to pay assessments.

If this seems a harsh result, it should be kept in mind that this is not a mutual company; it was and is at least theoretically a company organized and operated for purposes of profit. We are not apprised as to what portion of the originally contemplated 50,000 acres of water rights have been sold, but counsel himself seems to agree with testimony of Carroll that since the 1934 drought and the decision in Laramie Rivers Company v. LeVasseur (1949), 65 Wyo. 415, 202 P.2d 680, "Lake Hattie has not been a dependable going concern". Under Section 9 of the agreement plaintiff may at any time organize a water user's association and convey title to the system to that association thereby relieving itself of any burden. For reasons which it considers sufficient it has chosen not to do so, perhaps hoping that conditions will improve and it may some day be able to sell off additional water rights at a profit. In the meantime we see no reason why the owners of lands receiving no water should be required to continue payment of operation and maintenance when no water is made available to them.

Since plaintiff has failed to prove that it was ready, willing, and able in any of the years in question to deliver or tender delivery of water to the defendants as contemplated by the contract, we hold that the decision of the trial court dismissing the action was correct and it is affirmed.

PARKER, Chief Justice (concurring).

I have no disagreement with the prevailing opinion's statement that the company was obligated to provide a canal suitable for the delivery of water, including the maintenance and installation of a proper means of delivery; and the record is sufficient to support a finding that this obligation was not satisfied. However, I wholly disapprove either any actual or implicit holding that the company had an obligation to furnish water which by climate, act of

God, or other means beyond the company's control made water unavailable. The obligations of the parties in this case must emanate from the water right contract and there was nothing therein which so provided.

Incidentally, McHale v. Goshen Ditch Co., 49 Wyo. 100, 52 P.2d 678, is no authority for a position that the company must furnish water to the user before it is entitled to be paid the user's proportionate share of the company's annual operation and maintenance expense. Not only is such a pronouncement lacking in *McHale* but, even if one could be implied, attention is directed to an obvious distinction in that case and the one before us. In *McHale* the contract contained the following provision: "Company shall furnish water continuously during the irrigation season." In the present case, there is no such agreement or hint thereof.