273 P.2d 174

**FREEMAN v. STEWART et al.**

No. 8183.

Supreme Court of Utah.

July 7, 1954.

Clyde B. Freeman, pro se.

Weston L. Bayles, Earl S. Spafford, Wm. T. Thurman, Salt Lake City, for respondent.

Alvin I. Smith, Salt Lake City, amicus curiae.

CROCKETT, Justice.

The Salt Lake City Suburban Sanitary District was created on September 9, 1946,

by resolution of the Salt Lake County Commission for the purpose of constructing and operating a sewer system in certain of the unincorporated area in Salt Lake County. The formation of the district was initiated by petition in accordance with law.[1] In March of 1953, this Court issued a writ prohibiting it from proceeding further with a proposed financing plan on the ground that it did not afford due process of law to the residents of the district, they having been given no notice or opportunity to protest the plan, which would have imposed liens upon their property.[2]

Thereafter the Legislature passed an amendatory act, Chapter 29, Laws of Utah 1953 (all references to statutes hereinafter refer to that chapter) and the proceedings here under review were taken by the district according to its provisions. Pursuant thereto, a public meeting was called and held on August 10, 1953, after being advertised according to law in two daily newspapers in circulation in Salt Lake County. At the hearing no protests were made opposing the operating of the district under the new law. On September 15, 1953, an election was held in the district and property owners therein approved by a vote of more than five to one the issuance of general obligation bonds in the principal amount of $2,410,000 and revenue bonds in the principal amount of $6,480,000. Two months later, on November 18, 1953, the trustees of the district (who are the County Commissioners of Salt Lake County) adopted a resolution authorizing the issuance of the aforesaid bonds.

The plaintiff commenced this action for a declaratory judgment, raising several questions as to the propriety and constitutionality of the bond issue. From an adverse judgment entered against him below, the plaintiff appeals.

The plaintiff's first point of attack is that the statutes authorizing the creation of the sanitary district contravene several provisions of the Constitution of Utah: That they set up a municipal corporation in violation of the prohibitions against the creation of such corporations by special law;[3] that they violate the interdiction against the legislative imposition of taxes for the purposes of a municipal corporation;[4] and that they provide for incurring debts in excess of the constitutional debt limit on municipal corporations.[5] These contentions have been dealt with and given

1. Ch. 6a, Title 19, U.C.A. 1943 (now Ch. 7, Title 17, U.C.A. 1953.)

2. Bigler v. Greenwood, Utah, 254 P.2d 843.

3. Art. XI, §5; Art. VI, § 26.

4. Art. XIII, § 5.

5. Art. XIV, § 4: "No city, town, school district or other municipal corporation, shall become indebted to an amount * * * exceeding four per centum of the value of the taxable property therein, * * *."

extensive consideration by this court in a number of cases [6] in which we have held that improvement districts are a separate entity of government and not "municipal corporations" as contemplated by the Constitution. Therefore, the above constitutional provisions do not apply to the sanitary district involved in the instant case.

We are asked to review the correctness of those decisions. Even if we were inclined to do so, the doctrine of stare decisis now stays our hands. It is one of the important principles in the structure of our law. In a well-ordered society it is important that people know what their legal rights are, not only under constitutions and legislative enactments, but also as defined by judicial precedent, and having conducted their affairs in reliance thereon, ought not to have their rights swept away by judicial decree.[7] And this is especially so where rights of property are involved. The law laid down in these decisions has been acted upon and numerous improvement districts created and financed, so that it must be said to be a rule of property with respect to which the doctrine should apply with all its force. And it should be left to the legislature to make any change in the law, except perhaps in a most unusual exigency.

This universally accepted idea is illustrated by the expression of the Supreme Court of New Mexico, speaking in respect to an irrigation project: "In the nineteen years since that decision it may be assumed that many thousands of acres * * * have been sold to purchasers who relied on that decision * * *. Whether it stated the correct rule of law * * *, it is now a rule of property that we will not disturb." [8]

Plaintiff further challenges the project on the ground that the designation of the County Commissioners as trustees of the district is an arbitrary imposition upon him of the authority of officers for whom he had no opportunity to vote; that to permit them to levy taxes amounts to taxation without representation; and that the commissioners themselves are not qualified because the act provides that the trustees shall be residents and taxpayers within the district, whereas two of them admittedly do not there reside.

Under circumstances anticipated by the Legislature, it was necessary that some structure be set up for initiating the operation of such districts. The act constitutes the County Commissioners as trustees and confers upon them authority to appoint successor trustees, but it is also provided

6. Patterick v. Carbon Water Conservancy District, 106 Utah 55, 145 P.2d 503; Tygesen v. Magna Water Co., Utah, 226 P.2d 127; Lehi City v. Meiling, 87 Utah 237, 48 P.2d 530; Provo City v. Evans, 87 Utah 292, 48 P.2d 555; and most re-

cently, Barlow v. Clearfield City Corp., 1 Utah 2d 419, 268 P.2d 682.

7. See Allen v. Board of Education, Utah, 236 P.2d 756.

8. State ex rel. Bliss v. Dority, 55 New Mex. 12, 225 P.2d 1007, 1019.

that upon petition, signed by at least 10 per cent of the persons eligible to vote on a bond issue, being filed within thirty days prior to the date of a bond election, or ninety days prior to any succeeding election, the County Commissioners shall be required to hold an election.[9] This provision relating to the appointment of the County Commissioners as trustees appears to have been a convenient and expedient method of setting the machinery of the district in motion. It finds support in the law. This court said in Lehi v. Meiling,[10] supra,

"Objection is urged that the members of the board are not elected by the electors of the district but are appointed by the governing authorities of the cities or towns as representatives of such municipalities. We, however, find no provision of the Constitution which limits the power of the Legislature to provide for the governing or control of such public agencies by officers selected in the manner provided rather than by election. In the absence of constitutional provision controlling legislative action in this respect, the choice of methods by which the governing body may be selected is within the discretion of the Legislature."

It is reasoned that the plaintiff and others similarly situated are represented in the state Legislature which created the Act. Ample time existed to invoke the procedure by which 10 per cent of the eligible voters could have required an election of other officers, but no such petition was filed and as far as the record shows, neither plaintiff or anyone else made any effort to do so.

As to the claimed arbitrary imposition of taxes by the officers of the district, the Legislature merely passed enabling legislation, the trustees proposed an election to determine whether the financing plan should be initiated which was approved by the property holders. This resulted in authorizing the trustees to go forward with the financing project in accordance with the provisions of the statute. The designation of officers and vesting them with such authority has been heretofore approved by this Court in a number of cases, the most recent of which was Barlow v. Clearfield City, supra.

The foregoing discussion is also pertinent in answer to the contention that the commissioners are not qualified to serve as trustees because they are not residents of the district. The fact of their nonresidence has in no way prejudiced the plaintiff, but more important so far as his rights are concerned, is the fact that they could have been removed and other officers elected, had the people so desired, and at any rate they are constituted by law as at least de

9. Ch. 29 S.L.U. 1953, 17–6–3.1(3).

10. 87 Utah 237, 48 P.2d 535. See footnote 6; see also 1 McQuillin Municipal Corporations (2nd Ed.) 387.

facto officers who could serve in such capacity until others were substituted.

■ The provisions of the new Act being followed herein, providing for notice to interested persons and an opportunity to be heard, protest procedure, for application to obtain special treatment for property not benefited, and for appeal to the district court for review, obviate the procedural defects as to due process of law, upon which the ruling in the Bigler case, supra, was based and are sufficient "safeguards of a party's rights." [11]

We proceed to a consideration of plaintiff's contention that the proposed bond issues exceed the debt limit set in chapter 29 itself. Section 5 indicates that the general obligation bonds shall " * * * never be issued in an amount which * * * will exceed in total principal amount twelve (12) per cent of the assessed value of the taxable property in the district * * * " and further, "Bonds issued * * * payable solely from revenues * * * shall not be included as bonded indebtedness of the district for the purpose of such computation." The parties agree that the $2,410,000 is a valid issue of general obligation bonds as it is within the 12% limitation on $22,000,-000 assessed valuation. The difficulty confronting the district is plaintiff's insistence that the $6,480,000 issue which are called "revenue bonds" are in actuality also general obligations of the district because, he

avers, they are to be paid indirectly at least from tax funds. The plaintiff relies on Utah Power & Light Co. v. Provo City, 94 Utah 203, 74 P.2d 1191, 1207, wherein we said that: "revenue bonds" must be "paid only from the revenues received * * * from the plant to be erected, [and] may not, directly or indirectly, be a charge on, or paid from revenues derived from taxation" and other cases of that purport.

■ It must be kept in mind that in the Provo City and other such cases the court was dealing with the constitutional debt limit which, as hereinabove mentioned, does not apply to this improvement district. The Legislature was free to allow these improvement districts to incur indebtedness as it saw fit,[12] and likewise could employ its own meaning as to terms and classify the bonds to be issued as general obligation or revenue bonds as meant in this particular enactment. We therefore are here concerned only as to whether the so-called revenue bonds are "payable solely from revenues" within the contemplation of Chapter 29, S.L.U.1953.

There is no doubt that the district can and intends to keep the revenues collected from connection and service charges in a separate fund and literally pay the revenue bonds from such funds. The question is whether the fact that certain other means are provided for the district to obtain funds,

11. Patterick v. Carbon Water Conservancy Dist., 106 Utah 55, 145 P.2d 503, 511.

12. Barlow v. Clearfield City, supra.

which enriches the district to that extent and releases more revenue to be paid on revenue bonds, compels the conclusion that the revenue bonds must be regarded as general obligation bonds. That such is the necessary result is urged by plaintiff because of three separate propositions: (a) a provision for a lien in case of delinquency, (b) the proposed use of funds from a four-mill tax levy for "operation and maintenance," and (c) the wording of section 5 which provides that: "if the bonds are payable primarily from revenues" the faith and credit and resources of the district is pledged to pay them and a tax is authorized to implement this commitment.

As to point (a) concerning the lien provision: plaintiff argues that because it is provided in 17–6–3.6 that when a customer remains delinquent in the payment of any charges due the district for a period of 90 days, the board may not only suspend service, but in addition the clerk of the district certifies the debt to the county treasurer, and upon such certification, it shall "become a lien on the delinquent premises on a parity with and collectible * * * in the same manner as general county taxes", that this has the effect of making the property security for the debt, so that the revenue bonds, being so guaranteed, are in fact general obligations of the district.

It is to be observed that in no event does the lien upon property vest until a delinquency occurs and certain procedure is followed, and then only against the individual customer. In no way could such a delinquency, or any aggregate of them, become a general obligation of the district in the sense that a general tax could be levied against all property in the district in order to collect such delinquent charges. The lien provision does have the salutary effect of assuring that the district will collect its charges and that all customers will be obliged to pay for the services rendered them, eliminating the possibility that some of the customers will bear the burden for those who do not meet their bills. Inasmuch as we are looking only to the Act itself to see what the effect of the lien feature is, it seems clear that the Legislature in speaking of both general obligation bonds to be supported by a tax, and revenue bonds to be paid from revenues, and having done so, provided for the collection of revenues by means of the lien procedure herein described, clearly did not intend that such method of collection would have the effect of changing the character of the revenue bonds into general obligation bonds. The fundamental fact is that the service charges, however collected, are but revenues derived from the operation of the district. The fact that the Legislature saw fit to provide an effective method of collection of delinquent charges does not change the character of the fees which are collected by this method, nor the nature of the bonds which are guaranteed by it.

As to his point (b): plaintiff reasons that because the trustees of the district,

under the resolution adopted by them on November 8, 1953, propose to use funds to be raised by a four mill tax levy authorized by 17-6-3.8 for the "operation and maintenance", the money raised by such four mill levy pays the operating expenses for which revenues should be used, thereby releasing revenues for the payment of revenue bonds, which, he also argues, makes them general obligation bonds in that they are payable, indirectly at least, from taxes.

The authorization for the four mill levy in Section 17-6-3.8 about which we are concerned is:

"Without in any way limiting the powers hereinabove reposed in districts created under this act, it is expressly provided that each such district shall have: * * *

"(b) The power to cause to be levied as above provided, taxes on all taxable property in the district for the carrying out of the purposes for which the district is created; provided, however, that the taxes so levied for any district shall not in any year exceed 4 mills on each dollar of valuation of taxable property in the district." (Emphasis ours.)

It is significant to note that the above section was passed with full awareness that provision had already been made for the issuance of both general obligation and revenue bonds, and that Section 17-6-3.5 had authorized the district to tax without limit to pay the general obligation bonds.

Section 17-6-3.8 contains no limitation or restriction that such funds should be used only for payment of general obligation bonds, but on the other hand specifies in broad language that the levy may be made "for the carrying out of the purposes for which the district is created". It can hardly be doubted that the "operation and maintenance" of a sewer district is one of the purposes for which the district was created, pointing rather persuasively to the conclusion that the Legislature intended that the monies raised by the four mill levy was to be used for that purpose.

In view of plaintiff's contention, we are led to inquire as to what use the Legislature did intend for the money raised by the four mill levy. Speaking broadly, the district will have only four categories of expense upon which it can disburse funds: (1) On revenue bonds, (2) on general obligation bonds, (3) for construction (a reserve fund for which is to be set up out of revenues) and (4) for operation and maintenance.

We are obliged to assume that the Legislature had some object in conferring the authority to levy the four mill tax,[13] so it must necessarily have been to raise money to be expended for one or more of the four purposes just mentioned. Which could it have been? As to (1): It could not have

13. Mason v. U. S., 260 U.S. 545, 43 S.Ct. 200, 202, 67 L.Ed. 396.

been for direct payment of revenue bonds because, by definition, if they were to be so paid by taxes they would not be revenue bonds; as to (2) the general obligation bonds: the Legislature had already in Section 17–6–3.5 conferred authority to levy "regardless of any limitations" to meet the obligations on them, so it would have been a useless thing to authorize an additional levy of four mills for that same purpose. Obviously, it was for some other purpose than to meet the general obligation bonds.

Elimination of the possibility of using the four mill levy for expenditures in classes (1) or (2) above, leaves only (3) (a fund for construction) and (4) (operation and maintenance) in which such funds could be used. Its application for either of those uses would have had the effect of releasing service charge revenues which otherwise would have been used for such purposes, so that the district would be enriched to that extent and thus made better able to meet all of its obligations, including its revenue bonds. In fact, except for the general obligation bonds, the expenses of which is elsewhere amply provided for, we are unable to conceive of any purpose for which the four mill levy could be used which would not have the effect of relieving the burden on revenues. If funds raised by the four mill levy could not be so used without having the effect of making the revenue bonds general obligation bonds, then the Legislature was speaking idly in referring to the issuance of revenue bonds in addition to the 12% general obligation bonds as a conjoint method of financing such districts; and similarly, was without purpose in permitting the levy of four mills in addition to the authority to make an unlimited levy to pay the general obligation bonds. The foregoing analysis leads to the conclusion that the Legislature must have intended the four mill levy could be used for operation and maintenance.

This conclusion is further borne out by this language in Section 17–6–3.6: "If any bonds issued hereunder are * * * to be payable solely from revenues * * * from the operation * * * the bonds so issued shall be payable from and secured by the pledge *of all or any specified part* of the revenues to be derived by the district from the operation * * *" and also by a similar expression, Section 17–6–3.8: "(d) The power to impose and collect charges or fees * * * and to pledge *all or any part* of the revenues so derived to the payment of any bonds of the district * * *." (Emphasis added.)

Thus expressly permitting the pledge of *all* revenue for the payment of revenue bonds, accords with the analysis above set forth that it must have been contemplated that the proceeds of the four mill tax could be used to pay the cost of operation and maintenance. It seems apparent from a consideration of the entire Act that the Legislature in speaking of "bonds payable solely from revenues," meant just that literally. And so long as the funds which

are used to pay the revenue bonds are derived only from revenues, and kept separate as. is planned, and paid on such bonds, they are to be considered revenue bonds. It was within the power of the Legislature to provide that the system could so operate, and it seems manifest from the purport of the ·Act that joint financing with the two types of bonds was contemplated, and that the use of the four mill fund for "the purposes for which the district is created", one of which certainly is the "operation and maintenance" of a sewer district, would not have the effect of converting its revenue bonds into general obligations and thus curtail its ability to finance by both methods.

█ Under the proposition designated (c) plaintiff further attempts to demonstrate that the revenue bonds are actually general obligations of the district payable out of taxes, upon the basis of the following language of Section 17–6–3.5: "* * * or *if the bonds are payable primarily from revenues,* then [the trustees shall] anticipate and make up any amounts which may be necessary to pay such principal and interest by reason of deficiencies in such revenues" which is to be done by levying a tax "regardless of any limitations contained elsewhere in the laws of Utah and this act, * * *." If the just quoted language were taken by itself, it might be interpreted as plaintiff says. But read and understood in context, it is clear that such interpretation is but a strained attempt to make it appear ·to be talking of bonds payable from reve-

nues such as the $6,480,000 issue here in question, whereas a consideration of the entire section from which the above quoted language is extracted, manifests this privilege of taxing without limit does not apply to such bonds.

We quote more fully from the provisions pertinent to this contention made by the plaintiff, inserting bracketed words which are necessarily implied and which serve to clarify the meaning of the language and demonstrate the error of plaintiff's interpretation. "Bonds issued in such manner that they are payable solely from revenues * * * shall not be included as bonded indebtedness of the district for the purpose of such computation. [The 12% limitation] All bonds not issued payable solely from such revenues shall be the general obligations of the district [as distinguished from revenue bonds] and the full faith, credit and resources of the district shall be pledged for the payment thereof, [the general obligation bonds] and regardless of any limitations contained elsewhere in the Laws of Utah and this act, * * * it shall be the duty of the board of trustees to cause to be levied annually on all taxable property in the district taxes fully sufficient to pay principal of and interest on such bonds [i. e. the aforesaid bonds, meaning general obligation bonds] as principal and interest fall due, or if the bonds [the aforesaid general obligation bonds] are payable primarily from revenues, then to anticipate and make up any amounts which may be

necessary to pay such principal and interest by reason of deficiencies in such revenues."

What makes plaintiff's position plausible is the use of the clause "or if the bonds are payable primarily from revenues". General obligation bonds can be, and under this financing proposal actually are, payable *primarily* from revenues and secondarily from taxes. That fact does not change their character as general obligation bonds, nor does it mean that bonds referred to as being payable primarily from revenues are necessarily only revenue bonds. The section is obviously purposed toward giving power to tax to support the general obligation bonds, and of course the power so conferred does in fact make such bonds general obligations of the district, but this does not apply to the bonds of the class of the $6,480,000 revenue bonds, which are not bonds payable just *"primarily* from revenues" but as has been set forth herein, are payable *"solely* from revenues" within the meaning of the act.

It therefore follows that such bonds are not to be included in the 12% debt limit on general obligation bonds and the plaintiff's contention must fail.

Judgment affirmed. Costs to respondents.

McDONOUGH, C. J., and WADE, J., concur.

WORTHEN, J., concurs in the result.

HENRIOD, J., does not participate.