No. 52,879

F. Arthur Stone & Sons, *Appellants,* v. Guy E. Gibson, Chief Engineer and Director, Division of Water Resources, and Kansas State Board of Agriculture, *Appellees.*

(630 P.2d 1164)

Opinion filed July 17, 1981.

*John E. Howe,* of Burlingame, argued the cause and *Lelyn J. Braun,* of Garden City, was with him on the brief for the appellants.

*Leland E. Rolfs,* of the Kansas State Board of Agriculture, argued the cause and was on the brief for the appellees.

*Van Smith,* of Smith Law Office, P.A., of Garden City, was on the brief *amicus curiae,* Southwest Kansas Groundwater Management District No. 3.

The opinion of the court was delivered by

Herd, J.: F. Arthur Stone and Sons appeal a trial court ruling

sustaining an order for Stone to cease and desist from appropriating irrigation water from two wells on his land. The order was made pursuant to K.S.A. 82a-728.

The controversy arose from these undisputed facts. On December 4, 1979, F. Arthur Stone and Sons applied to the chief engineer of the Division of Water Resources of the State Board of Agriculture for irrigation water appropriations on each the Northeast Quarter (NE4) and the Northwest Quarter (NW4) of Section Eight (8), Township Twenty-six (26) South, Range Thirty-three (33) West, Finney County, Kansas. Each application sought water in the amount of 272 acre feet per calendar year to be pumped at a maximum rate of 1000 gallons per minute. Applications are numbered in sequence as received by the chief engineer. These two applications are No. 33,672 and 33,673, indicating the number of water appropriations applied for since the law was enacted in 1945.

On February 1, 1980, the Division, through its chief engineer, Guy E. Gibson, denied the applications and notified the Stones by letter that it was not in the public interest to authorize additional irrigation wells in the area because it would violate the aquifer depletion criteria adopted by Southwest Kansas Groundwater Management District No. 3. The Stones' land is located in District No. 3. In the same letter the Stones were advised K.S.A. 82a-728 provides it is unlawful to threaten to appropriate or to appropriate irrigation water from any source without first obtaining a permit. Violation of that section incurs criminal penalties.

On May 19, 1980, the chief engineer was notified by Rick Illgner, manager of Groundwater Management District No. 3, that two irrigation wells had been drilled and equipped and center pivots installed on the Stones' land. On June 6, 1980, the chief engineer notified appellants to cease and desist from appropriating water by the two irrigation wells. The order contained a mistake in the land description and was corrected on June 13, 1980. The Stones appealed the cease and desist order to the district court on July 9, 1980. The order was sustained by the district court on December 22, 1980. This appeal followed.

Appellants do not attack the entire Water Appropriation Act, but confine their appeal to a challenge to the constitutionality of K.S.A. 82a-728, which provides:

"Except for the appropriation of water for the purpose of domestic use, the

production and return of salt water in connection with the operation of oil and gas wells in accordance with the written approval granted therefor by the Kansas corporation commission pursuant to K.S.A. 55-901, the withdrawal and use of water in accordance with provisions of K.S.A. 82a-1313 and the diversion and use of surface water impounded in any reservoir for beneficial purposes in a quantity not exceeding fifteen (15) acre feet per year, it shall be unlawful for any person to appropriate or threaten to appropriate water from any source without first applying for and obtaining a permit to appropriate water in accordance with the provisions of chapter 7 of article 82a of the Kansas Statutes Annotated and acts amendatory thereof or supplemental thereto or, for any person to violate any condition of a vested right, appropriation right or an approved application for a permit to appropriate water for beneficial use. As used in this subsection salt water shall mean water containing more than five thousand (5,000) milligrams per liter chlorides.

"(b)(1) The violation of any provision of this section by any person is a class C misdemeanor. (2) Each day that any such violation occurs after notice of the original violation is given by the chief engineer to any such violator by registered mail shall constitute a separate offense."

Appellants maintain the exemption of domestic water users from the requirement to obtain a permit to appropriate violates Kans. Const. Bill of Rights § 1, which provides:

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

Appellants claim the statute is discriminatory and unfair, and is not a uniform application of the law. It is well-established that every statute comes before this court with a presumption of constitutionality. That presumption continues until it is clear the statute violates the constitution. All doubts of validity must be resolved in favor of the constitutionality of the statute, without concern for the wisdom, economic policy or social desirability of the law. Those concerns are the prerogative of the legislature. *Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, Syl. ¶ 3, 408 P.2d 877 (1965).

Appellees cite *Woods v. Schneider,* 224 Kan. 535, 537, 581 P.2d 390 (1978), and *Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015 (1976). In *Woods v. Schneider,* the court faced an equal protection challenge and the opinion collected several rules for weighing such a challenge, quoting *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 616, 576 P.2d 221 (1978):

" 'Our next concern is whether the statute offends the equal protection clause. When considering this question we must first determine the proper test. Traditionally, the yardstick for measuring equal protection arguments has been the

"reasonable basis" test. The standard was set forth in *McGowan v. Maryland,* 366 U.S. 420, 425-26, 6 L.Ed.2d 393, 81 S.Ct. 1101:

" ' ". . . The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. . . .' "

" 'In *Dandridge v. Williams,* 397 U.S. 471, 25 L.Ed.2d 491, 90 S.Ct. 1153, *reh. denied* 398 U.S. 914, 26 L.Ed.2d 80, 90 S.Ct. 1684, it was stated:

" ' ". . . If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' [Citation omitted.]" ' "

### Brown v. Wichita State University, 219 Kan. at 13, 16, provided:

"In social and economic legislation, a statutory classification does not violate the equal protection clause merely because its classifications are imperfect. [Citations omitted.]

. . . .

"In the absence of a suspect classification or a violation of a fundamental right, a statutory discrimination should not be set aside if *any state of facts reasonably may be conceived to justify it.* [Citations omitted.]

"The United States Supreme Court states in *Ferguson v. Skrupa,* 372 U.S. 726, 10 L.Ed.2d 93, 83 S.Ct. 1028, 95 A.L.R.2d 1347:

" '. . . Statutes create many classifications which do not deny equal protection; it is only "invidious discrimination" which offends the Constitution. . . .'(p. 732.)"

Is there a reasonable basis for exempting domestic water users from the requirement to obtain a permit to drill a well? K.S.A. 82a-701(*c*) states:

" 'Domestic uses' means the use of water by any person or by a family unit or household for household purposes, or for the watering of livestock, poultry, farm and domestic animals used in operating a farm, and for the irrigation of lands not exceeding a total of two (2) acres in area for the growing of gardens, orchards and lawns."

In order to determine whether the classification is reasonable, we must first examine the uses contemplated under the statute. Appellants contend the definition of domestic uses could encompass many questionable operations involving large quantities of water. They point to the following query raised in a recent article on water rights in Kansas:

"That portion pertaining to 'the watering of livestock' has created problems which are more than academic. Does the term 'livestock' mean two cows for the purpose of furnishing dairy products to the farm family, or does it mean a commercial dairy? Or, perhaps does it mean feeding two steers for home consumption, or does

it mean a feedlot containing several hundred cattle? These questions have not been before our Supreme Court." Windscheffel, *Kansas Water Rights: More Recent Developments,* 47 J.B.A.K. 217, 218 (1978).

The issue raised is well taken but not persuasive. Referring to the examples raised in the article, we note feed lots and commercial dairies constitute industrial uses which do not fall within the definition of domestic use. In *Crawford Co. v. Hathaway,* 67 Neb. 325, 93 N.W. 781 (1903), the court found the term "domestic purposes," in the Nebraska statute, referred to domestic users recognized by the common law. The court observed the common law distinguished between those modes of use which commonly involved a limited taking of water with slight interference with the stream and those which commonly involved a considerable taking with a pronounced interference with the ordinary stream flow, stat'ng: "The use of a stream in the ordinary way by a riparian owner for drinking and cooking purposes and for watering his stock, is a domestic use." *Crawford Co. v. Hathaway,* 67 Neb. at 372. A farmer or rancher running a normal number of livestock on his premises which can be adequately watered with 50 gallon per minute wells is a domestic user. For example, a thousand steers would drink no more than 10,000 gallons of water per day. An irrigation well pumps that volume in 10 minutes. Domestic users divert less than 1% of the water used in the state, making relatively no impact on the aquifer. In fact, normal recharge replaces the water used for domestic purposes, eliminating the need for regulation of such use. The use of water primarily for human consumption is a domestic use and is essential to life. Domestic use has historically been classified as ordinary use while all other uses were artificial or extraordinary and the classification is a codification of that definition of water users.

For the foregoing reasons, the legislature exempted domestic users from the requirement that they obtain a permit prior to drilling a well. The classification has a reasonable basis and does not offend the constitution.

This country has followed two essentially different water law doctrines: The common law or riparian doctrine and the appropriation doctrine. The common law concept originated in areas with abundant water while the appropriation doctrine developed in semi-arid areas.

The riparian doctrine found its way into the English common law around 1851 coming from European civil law by way of this country. Its basis was location of the water. Water rights attached to the land contiguous to a stream and were recognized as real property rights.

Special rules applied to ground water. If the courts determined such water was an underground stream they applied the rules applicable to surface streams. If they determined such water was percolating, they applied the English or common-law rule of absolute ownership. This doctrine was based on the maxim, *Cujus est solum, ejus est usque ad coelum et ad inferos*—to whomsoever the soil belongs, he owns also to the sky and to the depths. Black's Law Dictionary 453 (4th ed. 1951). Percolating water was said to be a part of the land in the same way that sand, gravel, rocks and clay are part of the land, giving the landowner a property right in the water. *Jobling v. Tuttle,* 75 Kan. 351, 89 Pac. 699 (1907); *City of Emporia v. Soden,* 25 Kan. 588, 37 Am. Rep. 265 (1881). The landowner could take as much of his water as he wanted regardless of its effect on adjoining landowners. This doctrine was soon modified to the "American" or "reasonable use" rule, giving a landowner only a right to reasonable beneficial use to the underground percolating waters. 78 Am. Jur. 2d, Waters § 158, p. 607.

The appropriation doctrine is based upon the premises that all unused water belongs to all of the people of the state. The first person to divert water from any source and use it for beneficial purposes has prior right thereto. In other words, first in time, first in right. This doctrine is said to reward development by giving the early appropriator the fruits of his industry. The rule gives greater certainty of rights while affording a more flexible administration of the law and encourages free enterprise by protecting a developer's investment. It discourages waste of a valuable resource and distributes the resource in response to demonstrated need.

Although Kansas adopted common-law rules relating to water rights when it became a territory and later a state, the legislature sanctioned appropriation rights before the turn of the century. L. 1886, ch. 115, § 1; L. 1891, ch. 133. It was not until 1945 that Kansas adopted the Water Appropriation Act of Kansas and provided an effective procedure for acquiring water appropriation

rights. G.S. 1935, 82a-701 *et seq.* (1945 Supp.). The act took effect on June 28, 1945. K.S.A. 82a-702 states:

"All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed."

K.S.A. 82a-705 provides:

"No person shall have the power or authority to acquire an appropriation right to the use of water for other than domestic use without first obtaining the approval of the chief engineer, and no water rights of any kind may be acquired hereafter solely by adverse use, adverse possession, or by estoppel."

The Act recognizes the existence of vested rights, K.S.A. 82a-701(*d*), to continue the use of water applied to a beneficial use prior to the effective date of the Act. Those vested rights are not impaired by the Act. K.S.A. 1980 Supp. 82a-703. K.S.A. 82a-706 gives the chief engineer of the Division of Water Resources of the State Board of Agriculture authority to:

"[E]nforce and administer the laws of this state pertaining to the beneficial use of water and shall control, conserve, regulate, allot and aid in the distribution of the water resources of the state for the benefits and beneficial uses of all of its inhabitants in accordance with the rights of priority of appropriation."

The right of priority is governed by the doctrine of "first in time, first in right." K.S.A. 82a-707(*c*).

The Act also provides an application, made in good faith and proper form, shall be approved by the chief engineer if it will neither impair a use under an existing water right nor prejudicially and unreasonably affect public interest. That determination is made by considering:

"[T]he area, safe yield and recharge rate of the appropriate water supply, the priority of existing claims of all persons to use the water of the appropriate water supply, the amount of each such claim to use water from the appropriate water supply, and all other matters pertaining to such question. With regard to whether a proposed use will impair a use under an existing water right, impairment shall include the unreasonable raising or lowering of the static water level or the unreasonable increase or decrease of the streamflow or the unreasonable deterioration of the water quality at the water user's point of diversion beyond a reasonable economic limit." K.S.A. 1980 Supp. 82a-711.

In sum, no water rights, except for domestic use, may be established in Kansas without complying with the statutory procedure.

The Act which represents a major departure from the com-

mon-law concept of absolute ownership of water underlying a landowner's real estate, was found constitutional in *State, ex rel. v. Knapp,* 167 Kan. 546, 207 P.2d 440 (1949); *Baumann v. Smrha,* 145 F. Supp. 617 (D. Kan. 1956) and in *Williams v. City of Wichita,* 190 Kan. 317, 374 P.2d 578 (1962), an exhaustive opinion to which Justice Schroeder, now Chief Justice Schroeder, vigorously dissented on the basis of the common-law theory of absolute ownership.

In *State, ex rel. v. Knapp,* 167 Kan. at 551, this court noted that as a result of a Governor's committee report it was concluded a change was needed in the law relative to water use in Kansas:

" '[T]wo things are needed, (1) to establish the right of appropriation under the rule of priority of right, and (2) to establish adequate administrative control over the appropriation of water to prevent overdevelopment of any source of supply with resulting injury to established uses.' "

We also noted if the Act made any changes in the common-law rights of riparian owners, G.S. 1935, 77-109, effective since 1868, authorized the legislature to change the common law. *Knapp,* 167 Kan. at 552.

Commenting upon the constitutionality of the Act, the court stated at page 555:

" 'All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein provided.' [G.S. 1947 Supp. 42-702.] This is the heart of the statute. The rest of it treats of details and procedure. It forms the basis for a different approach to the solution of questions concerning water rights than we have had in some of our opinions. Heretofore we have approached the questions largely on the basis of individual interest alone. Under this declaration and other provisions of the act we now approach them upon the basis of the interest of the people of the state without losing sight of the beneficial use the individual is making or has the right to make of the water. Unused or unusable rights predicated alone upon theory become of little if any importance. Broad statements found in some of our opinions, such as 'Every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration' [citation omitted] must be disregarded or modified to harmonize with this declaration. The change is an appropriate one for the legislature to make. Individuals do not live alone in isolated areas where they, at their will, can assert all of their individual rights without regard to the effect upon others."

In *Baumann v. Smrha,* the United States District Court of Kansas stated that the Act "is cognizant with the latest decision of the Supreme Court of Kansas in *State ex rel. Emery v. Knapp,* 167

Kan. 546, 207 P.2d 440, which must be regarded as having overruled the earlier cases." 145 F. Supp. at 625.

The final and comprehensive decision relating to the constitutionality of the Act is *Williams v. City of Wichita,* 190 Kan. 317. As we noted, *"The need of stability in the water laws of Kansas cannot be overstressed."* 190 Kan. at 319. The court went on to state that the common-law rule, with respect to water, was unsuitable to modern day conditions and we found the legislature could change the principle of the common law and abrogate decisions made thereunder when, in its opinion, it was necessary to the public interest. We examined the constitutionality of the Act and noted the following:

"In passing the Act it is manifest that two major factors were uppermost in the minds of the legislators: First, that the doctrine of appropriation should be based upon the time of use and the actual application of water to beneficial use without regard to the ownership of land contiguous to the streams or the overlying lands, and Second, that unused water could not wisely be held in perpetuity for a common-law owner who may never have use for it, without resulting in underdevelopment permitting the water to flow out of the state and on toward the ocean, as an economic waste and loss of a valuable natural resource. To achieve that result, the doctrine of appropriation for beneficial use based upon the rule of priority of right (first in time is first in right) was established, and adequate administrative controls were provided to prevent overdevelopment of any source of supply with resulting injury to established uses." *Williams,* 190 Kan. at 334.

We carefully noted that all rights to the use of water established prior to the date of the Act, referred to as "vested rights" in the Act, may not be taken or destroyed in the absence of due process of law. *Williams,* 190 Kan. at 334.

The court concluded that an overlying landowner does not have absolute title to underground water which may lie below the surface of his land.

"He has the unqualified right to drill a well on his own land and take from the strata below all the water that he may be able to reduce to possession including that coming from land belonging to others, but the right to take and thus acquire ownership is subject to the power of the state to provide that it will be put to beneficial use and to prevent its unnecessary loss or waste, by requiring that the unused portion be made subject to the doctrine of appropriation.

. . . .

"The right of the plaintiff to ground water underlying his land is to the usufruct of the water and not to the water itself. Legislation limiting the right to its use is in itself no more objectionable than legislation forbidding the use of property for certain purposes.

. . . .

"We find nothing in the Act which in any manner offends the Fourteenth

Amendment to the constitution of the United States or in any way violates the constitution of Kansas. There is no inhibition in our constitution against legislation such as this regulatory Act which we find to be a proper and valid exercise of the police power.

. . . .

"The plaintiff claims that to require him to make application and furnish information for an appropriation permit to use water from his own land for beneficial purposes is a denial of due process. The contention is without substance. The Act, regulatory in purpose and nature, requires that water users make application and furnish information to the chief engineer of the Division of Water Resources concerning the proposed use (82a-709). Such a requirement is not a confiscation of water rights by legislative fiat. Rather, it is a proper and reasonable exercise of the police power of the state in controlling water use for the purpose of preventing waste and to conserve a valuable natural resource.

. . . .

"The suggestion that he has such rights in ground water underlying his land as must be acquired by eminent domain is untenable." *Williams,* 190 Kan. at 338-41.

This court in *Williams* clearly and firmly upheld the constitutionality of the Act holding regulation of water use is a legitimate exercise of the state's police power. The decision in *Williams* has been upheld by this court in four subsequent decisions: *City of McPherson v. Smrha,* 193 Kan. 556, 396 P.2d 269 (1964); *Williams v. Smrha,* 193 Kan. 557, 396 P.2d 270 (1964); *Williams v. Smrha,* 192 Kan. 473, 389 P.2d 756 (1964); and *City of Hesston v. Smrha,* 192 Kan. 647, 391 P.2d 93 (1964).

The *Williams v. City of Wichita* decision has become a rule of property law relied upon by the entire state. More than 34,000 applications have been filed under the Act for appropriation of water for beneficial use. Since the Act's inception, over 2,000 vested rights have been determined and innumerable sales of land and water rights have taken place in Kansas relying on the Act, as interpreted by *Williams v. City of Wichita.* The importance of stability in the law of property rights has been recognized elsewhere. *Freeman v. Stewart,* 2 Utah 2d 319, 273 P.2d 174 (1954); *State v. Dority,* 55 N.M. 12, 225 P.2d 1007 (1950). In *Freeman,* the Utah court explained it well at page 322:

"In a well-ordered society it is important that people know what their legal rights are, not only under constitutions and legislative enactments, but also as defined by judicial precedent, and having conducted their affairs in reliance thereon, ought not to have their rights swept away by judicial decree. And this is especially so where rights of property are involved. . . . And it should be left to the legislature to make any change in the law, except perhaps in a most unusual exigency."

Appellants argue K.S.A. 82a-728 is unconstitutional because *Williams* was based upon the fact the Act did not *require* a surface owner to obtain a permit to use the water under his or her land. See *Williams v. City of Wichita,* 190 Kan. at 338. Appellants argue the requirement is a transfer of property rights and the issuance of the cease and desist order in this case was a taking of private property without due process or compensation.

Our general references in *Williams* to the noncompulsory aspects of the Act did not represent a belief that mandatory requirements would prove constitutionally unsound, but were merely explanatory statements of the effect of the Act as it was then written. The amendment presently under fire is simply an extension of the regulations originally promulgated. The constitutionality of the grant of power to the Division of Water Resources, tested and upheld in *Williams,* is conceded by appellants.

Other jurisdictions have dealt with this issue. In *People v. Shirokow,* 26 Cal. 3d 301, 162 Cal. Rptr. 30, 605 P.2d 859 (1980), the property owner owned land through which a creek flowed. His predecessor in title had constructed a dam on the land without a permit from the water board. The State asked that the diversion of the water be enjoined and the trial court denied the State's request. On appeal, the court noted the California Water Code provided:

" 'All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the state and subject to appropriation in accordance with the provisions of this code." *Shirokow* at ,306.

The court interpreted that section to mean that the waters of the State of California were available for allocation in accordance with the Water Code to the fullest extent consistent with its terms. The court required the defendant to comply with the appropriation procedures and held the statutory permit procedure was the sole method of acquiring the right to appropriate water.

A Nevada landowner must have a permit before drilling for water in certain basins. Those mandatory provisions were upheld in *Griffin v. Westergard,* 96 Nev. 627, 615 P.2d 235 (1980). Mandatory requirements in water appropriation acts were also upheld in South Dakota, *Belle Fourche Irrigation Dist. v. Smiley,*

87 S.D. 151, 204 N.W.2d 105 (1973); Utah, *Baugh v. Criddle,* 19 Utah 2d 361, 431 P.2d 790 (1967) and *Hanson v. Salt Lake City,* 115 Utah 404, 205 P.2d 255 (1949); Oregon, *Re Water Rights of Hood River,* 114 Or. 112, 227 Pac. 1065 (1924); and in Wyoming, where the court in *Hamp v. State,* 19 Wyo. 377, 118 Pac. 653 (1911), stated:

"That the state may supervise and control the appropriation, diversion and distribution of the public waters, and impose that duty upon administrative officers, is settled by our former decisions, and is equally well settled in other states, where the doctrine of prior appropriation of water prevails. Indeed, it is suggested by Professor Freund in his work on the Police Power that the common law principle affecting the rights and duties of riparian proprietors, instead of being left so largely to judicial application and enforcement, might well be made the subject of statutory and administrative regulation." pp. 391-92.

"By such supervision no rights of private property are invaded, but, under the police power of the state, in the interest of the public welfare, and for the protection of private as well as public rights, property intended to be used for no other purpose than that of diverting public waters is regulated; and it is a mistaken notion that through such regulation private property is taken for either public or private use, within the meaning of the constitutional provision prohibiting such taking without just compensation. All property is held subject to such restraints and regulations as the state may constitutionally make in the exercise of its police power." pp. 403-04.

The Wyoming court made it clear in subsequent decisions that no water right may be initiated without compliance with permit requirements. *Laramie Rivers Co. v. LeVasseur,* 65 Wyo. 414, 202 P.2d 680 (1949); *Hereford Ranch v. Packing Co., et al.,* 33 Wyo. 14, 236 Pac. 764 (1925).

Finally, in Minnesota, the court in *Crookston Cattle v. Minn. Dept. of Nat. Res.,* 300 N.W.2d 769, 774 (Minn. 1980), stated:

"Like zoning legislation, legislation which limits or regulates the right to use underlying water is permissible. In *McShane v. City of Faribault,* 292 N.W.2d 253 (Minn. 1980), where plaintiff property owners argued that an airport approach zoning ordinance resulted in a 'taking,' we noted a distinction between interference with private property by regulation of property use, as through zoning, and interference by the government's physical intrusion. In the former category, we held that regulation which operated for the sole benefit of a governmental enterprise, a municipal airport, disproportionately burdened a few landowners, who were entitled to compensation. Where regulation operates to arbitrate between competing public and private land uses, however, as does the water priority statute in this case, such regulation is upheld even where the value of the property declines significantly as a result."

The nineteen western states have all accepted the fundamental principle that the state's right to provide for the appropriation of

unappropriated waters and to control the issuance of appropriative water rights falls clearly within the lawful exercise of the police power. It has also been generally held that the permit requirement is exclusive and violation of the requirement is punishable by criminal penalties. 1 Hutchins, Water Rights Laws in the Nineteen Western States, ch. 7, pp. 314-16 (1971).

K.S.A. 82a-728 does not launch the Division of Water Resources or its chief engineer into a new area of regulation. The original act declared all the water within the state to be dedicated to the use of the people subject to the State's control and regulation. The requirement that an appropriator must have a permit before appropriating is merely an extension of the regulations originally promulgated. The chief engineer was authorized in K.S.A. 82a-706 to enforce the laws pertaining to the beneficial use of water and to "control, conserve, regulate, allot and aid in the distribution of water resources of the state . . . ." Those general legislative grants of authority are a part of the original act which was declared constitutional in *Knapp* and *Williams.* Nothing has changed to cause this court to contemplate reversal. Water has become more scarce. Its use has multiplied dramatically with the growth of intensified agriculture in western Kansas. The rate of diversion is approximately ten times the rate of recharge. Irrigation is mining the water from the Ogallala aquifer. The consequences of increased irrigation are drastic. The legislature recognized the threat by the passage of the Act, the State Water Plan, K.S.A. 82a-901 *et seq.* and the authorization of the Groundwater Management Districts, K.S.A. 82a-1020 *et seq.*

Appellants' land is in Groundwater Management District No. 3 which is comprised of eight counties and parts of five other counties in southwest Kansas, containing approximately 5,722,000 acres. According to a management program booklet prepared by District No. 3 in 1978, and filed with this case, 1,600,000 acres were irrigated from about 7800 large capacity wells ranging from 100 to over 3,000 gallons per minute, withdrawing 3,000,000 acre feet of water per year. The increased demand for water in recent years has placed a heavy demand on the groundwater supplies. Most of the area covers water-bearing formations ranging in thickness from less than fifty feet to over 600 feet. The major water-bearing formation is the Ogallala aquifer underlying most of the district.

The Groundwater Management District engages in collection of geological data, research and education on use of water and, through an agreement with the chief engineer, review of applications for permits to appropriate water. As a reviewing agency, it has adopted aquifer depletion criteria which each applicant must meet. A proposed appropriation, when added to the vested rights and prior appropriation rights, shall not exceed a calculated rate of depletion of more than 40% in 25 years of the saturated thickness underlying the area of consideration around the proposed well. The area of consideration includes the legal section containing the proposed well and the eight adjacent sections. Appellants' applications were denied because they failed to meet that minimum criteria.

In *Williams* and *Knapp* we held the landowner has no absolute right to the water under his land, only a right to the use of it. We held water use regulation is an appropriate exercise of the state's police power. The provisions of K.S.A. 82a-728 comport with that exercise of authority. The statute does not effect an unconstitutional taking of property.

The judgment of the trial court is affirmed.

SCHROEDER, C.J., dissenting: This case illustrates the impact of the court's decision in *Williams v. City of Wichita*, 190 Kan. 317, 374 P.2d 578 (1962), and the reasons for my dissenting opinion to which I adhere.

The patent granted by the Federal Government to persons in Kansas who had established homestead rights to land settled prior to statehood transferred ownership of the land, including rights to the water beneath the surface, to those who homesteaded and their lawful successors in title in accordance with established Kansas law prior to the *Williams* decision. Kansas was not affected by the Desert Land Act of 1877 which affected the nature of landowners' titles acquired from the Federal Government in seventeen western arid states. Both our court and counsel for the Kansas State Board of Agriculture continue erroneously to cite water cases from these arid states as persuasive precedent.

In the *Williams* case the court upheld the Legislature's right to confiscate from the landowners of Kansas the water rights beneath the surface of the land. Why? The reason is stated in *Williams v. City of Wichita*, 190 Kan. at 340, as follows:

"The Act, regulatory in purpose and nature, requires that water users make application and furnish information to the chief engineer of the Division of Water Resources concerning the proposed use (82a-709). Such a requirement is not a confiscation of water rights by legislative fiat. Rather, it is a proper and reasonable exercise of the police power of the state in controlling water use for the purpose of preventing waste and to conserve a valuable natural resource."

Let us review the practical application of the entire Water Appropriation Act since 1962 to the facts in this case. Arthur Stone and his sons undertook to pump underground water from land they own to irrigate farm crops growing on their land. By order of the Chief Engineer of the Division of Water Resources they were ordered to cease and desist. This litigation followed.

Provisions of the Act authorizing the issuance of appropriation permits to those who first make application for the use of water from the area in question have been exhausted. The benefit of the rule "first in time is first in right" has spent its force. Application of this rule under the Act for the purported purpose of preventing waste and conserving natural resources is, of course, nothing more than *a redistribution of the wealth* to the favored few after the initial confiscation of the landowner's vested rights to his property. From now on the *redistribution* of the wealth (vested rights to the water) will be controlled by the *spoils* system. Under SB 303, L. 1981, ch. 302, § 1, enacted by the 1981 session of the Legislature, the Director of the Kansas Water Office will be a political appointee of the Governor.

What *waste* did the Legislature intend to prevent by the Water Appropriation Act? It was the nonuse of water which permitted it to *flow* out of the state and into rivers that emptied into the Gulf of Mexico. The *conservation* of a valuable natural resource, water, intended under the Act was *use* for the benefit of the state. Here the appellants intended to use the water for irrigation of farm crops on their land. Underground water drawn from their land would flow onto their land, permeate the soil, and return to replenish the underground water or be utilized in the growth and development of the farm crops irrigated. What is the waste? Is this not a beneficial use? The use of water by those holding permits to appropriate water will be identical.

Now, after the state has confiscated the vested property right of the landowner to the groundwater beneath the surface of his land and provided in the Act that "all water in the State of Kansas is hereby dedicated to the use of the people of the State," it is

paradoxical to give the Director of the Kansas Water Office sole authority *to redistribute these vested property rights* to *individuals* of his choosing who make application for a permit to appropriate water.

Furthermore, the statutory authorization of Groundwater Management Districts, K.S.A. 82a-1020 *et seq.,* is structured in such a way as to encourage participation only by those water users having vested rights to appropriate groundwater. This is accomplished by allowing a landowner who is not a water user to exclude his or her land from district assessments, with attendant loss of voting privileges, and by granting voting privileges to water users with vested rights to appropriate groundwater, whether or not they are landowners.

The result is the elected board of directors in groundwater districts will be holders of vested groundwater appropriation rights. A board of directors, whose membership consists of individuals having an interest in the preservation of their own vested right to the appropriation of groundwater, will not be sympathetic to others requesting new appropriation permits. In this case the Southwest Kansas Groundwater Management District No. 3 ruled that additional wells would violate their aquifer depletion criteria.

Unfortunately, the appellants in this case have not challenged the constitutionality of the 1945 Water Appropriation Act. The only challenge on constitutional grounds is to K.S.A. 82a-728. The basic decision upholding the constitutionality of the Act is *Williams v. City of Wichita,* decided in September, 1962. I am the only present member of the Kansas Supreme Court who participated in that decision. Here, ironically, counsel for the Kansas State Board of Agriculture argues *stare decisis* to uphold Supreme Court decisions since 1962, whereas the identical argument was made by the landowner Williams to uphold decisions of the Supreme Court prior to 1962 to affirm the trial court and have the Act declared unconstitutional, when *Williams v. City of Wichita* was decided.